LANDRY, Judge.
Defendant (Owner) has appealed from a judgment fixing the value of its land expropriated by Plaintiff (Department) for construction of Interstate Highway 10, in East Baton Rouge Parish, near the City of Baton Rouge. The sole issue presented is whether an owner-developer of property best suitable for residential subdivision purposes is entitled to be compensated at the retail value of the land taken, including a developer’s profit, less development costs, or at the amount a purchaser-developer would pay for the land on an acreage basis. The trial court awarded Owner the acreage value. We affirm.
On June 20, 1958, owner acquired a 105 acre tract of land for stage development into a unified, single family residential subdivision. Immediately thereafter Owner transferred a 15 acre section thereof to a church at Owner’s cost. It is conceded that the highest and best use of the entire tract was and is residential subdivision purposes. Shortly after acquisition, Owner obtained preliminary approval from the appropriate governing authority of a tentative layout of the entire remaining 90 acres into 182 lots under the name Audubon Terrace Subdivision. Concurrently plans were drawn for a sanitary sewer system disclosing the contours of the entire 90 acre plot. Final approval of a first filing for construction of Lots 1 through 79, inclusive, was obtained May 8, 1959, and recorded May 21, 1959. At that same time construction plans were prepared for development of the remainder of the property. Construction of Lots 1 through 79, including approximately 41.1 of the 90 acre tract, proceeded according to the approved plan, resulting in the creation of a first class residential subdivision zoned for single family occupancy. The original develop *815 ment included drainage, water, gas and sewer lines installed in such size and manner as to permit connection with and service of the undeveloped 48.8 acres. Streets were constructed and located to accord with the proposed development of Lots 80 through 182, inclusive. Some portions of the street rights of way in the undeveloped 48.8 acre section were cleared. Sales began in 1959, all save one or two transactions being conducted by officers of defendant corporation, each receiving only minimal compensation for such service. On commencement of this action in 1970, only 9 lots remained unsold in the initial 79 lot development. In 1959, it became known that the project for which this expropriation is necessary would involve the undeveloped portion of Owner’s property. For that reason, Owner made no further effort to improve the undeveloped portion of its property. The first 79 lots developed were constructed by Owner either with its own personnel or through controlling affiliates. The taking involves what may be described as three parcels. First, a wedge-shaped tract containing 14.36 acres taken from the northern portion of the parent tract. Second, all of Lots 1 and 2 situated at the southeastern corner of and abutting the above described 14.36 acre tract, containing 44,500 square feet. Third, the eastern portions of Lots 5, 6 and 7, lying South of Lots 1 and 2, containing 13,680 square feet. The taking leaves Owner 34.446 acres of undeveloped land and 1.184 acres remaining from Lots 5, 6 and 7.
It is undisputed that Owner is its own developer, had no intention of reselling the property to a developer or investor, and intended to develop the remainder of the property on its own. All of the experts agree the best and highest use of the property is A-l residential, single family, for which purpose it has been zoned for some time.
Owner maintains the facts of this case bring it within the rule announced in State of Louisiana, Through the Department of Highways v. Brooks, La.App., 152 So.2d 637; State of Louisiana, Through the Department of Highways v. Boyer, La.App., 130 So.2d 738, which hold that an owner-developer of subdivision land expropriated for public use is entitled to be paid the retail market value of the land, including a reasonable profit, less ordinary, reasonable development costs.
On the other hand, the Department urges that the willing seller-willing buyer rule should apply herein pursuant to which the owner of raw acreage is entitled to the market value of the land in the condition in which it exists at the time of taking, which does not include a developer’s profit, as has been held in numerous instances including, but not limited to, Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491; State, Department of Highways v. Monsur, La.App., 258 So.2d 162; State, Department of Highways v. Wolfe, La.App., 252 So.2d 483; State, Department of Highways v. Mayer, 257 So.2d 723.
Appearing on behalf of the Department, Julius A. Bahlinger, III, using three com-parables, appraised subject property at $4,250.00 per acre before the taking, or $202,762.00 for the 48.864 undeveloped acres. Using sales of the 79 developed lots, and sales of lots in adjacent subdivisions, he valued Lots 1, 2, 5, 6 and 7, containing 109,600 square feet, at 25‡ per square foot, or $27,499.00, making a total before taking value of $235,072.00. He valued the 14.36 acres taken at $61,047.00; the 44,500 square feet of Lots 1 and 2 taken at $11,125.00, and the 13,680 square feet of Lots 5, 6 and 7 taken at $3,420.00, a total of $75,592.00. Thusly he arrived at a before taking value of the remainder in the sum of $159,480.00.
After the taking, Bahlinger found 34.879 remaining acres consisting of 34.500 in the undeveloped area with which he incorporated .379 acres of Lot 5 remaining, making a remaining acreage of 34.879. From this, he subtracted a tract of 1.2 acres and one of 5.97 acres which he found unsuitable for subdivision purposes, leaving a bal- *816 anee of 27.709 undamaged acres valued at $4,250.00, or $117,763.00. To this, he added the remaining 35,065 square feet in Lots 6 and 7, valued at $.625 per square foot or $2,192.00, and the 1.2 acre tract valued at $1,000.00 per acre, together with the 5.97 acre plot valued at $2,000.00 an acre or $11,940.00, resulting in a total remainder value of $133,095.00 which, deducted from his estimated remainder value before the taking, resulted in a finding of severance damages in the amount of $26,385.00. Adding his severance damages to his appraisal of the land taken, he reached a total compensation figure of $101,977.00. Due to the irregular size and shape of subject tract, its exposure to the adjacent expressway and other factors, Bahlinger did not deem subject tract suitable for development into a quality subdivision at the same land cost. Mr. Bahlinger did not subscribe to the rule of thumb allegedly employed by some developers to the effect that on such projects, prices were predicated on a formula of 'iTjrd land cost, i/^rd development cost and l/jrd profit.
An appraisal was made for the Department by Chester Driggers. The Department did not call Mr. Driggers as a witness, neither did it offer his report in evidence. At the trial, counsel for Owner conceded a copy of Driggers’ report had been made available to him, and insisted that Mr. Driggers’ report be introduced in evidence without Owner being bound thereby. Mr. Driggers was present at the trial pursuant to a subpoena served upon him by Owner the day before trial to appear for cross-examination. Upon the Department declining to either introduce Mr. Driggers’ report or call Mr. Driggers as its witness, and Owner’s refusal to call Mr. Driggers as Owner’s witness, the court called Mr. Driggers as the court’s witness without objection from either party. Mr. Driggers divided the large acreage tract into three classes, namely, high land, average land and low land. Lots 1, 2, 5, 6 and 7 were considered on a square foot basis. Using comparables, he valued high land at $6,250.00 per acre; average land at $5,500.00 per acre, and low land at $4,000.-00 an acre. He valued the five lots at $.24 per square foot. Using this formula, he appraised the property before taking at $289,600.00, consisting of 20 acres of high land, 17.86 acres of average land, 10 acres of low land, and 109,792 square feet in the lots. Of the property taken, he found 14.-364 acres of high land valued at $89,775.00, and 58,242 square feet of lots worth $13,975.00, a total of $103,750.00 for the parts taken. This approach resulted in an indicated value of $185,850.00 for the remainder before the taking. In determining the after taking value of the remainder, Driggers considered the remaining portions of Lots 5, 6 and 7 (1.184 acres) as acreage which added to the 34.5 acres left in the large portion, gave a total of 35.684 acres remaining. Of this remainder, he found 17.384 acres to be average acres worth $5,500.00 per acre or $95,612.00, and 10 low acres valued at $4,000.00 per acre or $40,000.00. The remaining 8.3 acres, he deemed unsuitable for subdivision purposes and valued at $2,500.00 per acre or $20,750.00, a total after taking value of $156,360.00. He thusly estimated severance damages at $29,490.00, and total compensation due in the sum of $133,240.00.
Appearing for Owner, J. T. Doiron, Appraiser, unlike the other experts, considered subject tract as part of one larger parcel rather than two. He appraised the property as completed subdivision lots, both before and after the taking. Using compa-rables consisting of sales in Audubon Terrace Subdivision and adjacent subdivisions, he reached a retail market value of $60.00 per front foot. From the anticipated gross receipts of sales of all lots at the above figure, he deducted certain development costs, arriving at a value which includes a developer’s profit. The factor thus produced was then discounted over a six year period (his estimate of the time required to sell all in a completely developed subdivision). He did not, however, deduct from the indicated retail value such items as *817 sales commissions, taxes and interest on borrowed money. He reached a before value of $422,000.00 by deducting development costs of $18.00 per front foot for 11,440 front feet of lots, or $264,400.00 from the retail sale of said footage at $60.-00 per foot of $686,400.00. Dividing the profit of $422,000.00 by 6 (the estimated years required to sell all lots), Doiron arrived at an annual receipt figure of $70,333.00 to which he applied a 4.355 factor producing a discounted value of $306,290.00, including profit, before the taking. He then valued the part taken, 5,835 front feet at $60.00 per foot ($350,100.00) from which he deducted $18.-00 per foot development costs ($106,800.-00), producing a residual land and profit figure of $243,300.00. Discounted for 6 years on a 4.355 factor, this latter calculation resulted in a discounted value of $176,600.00 for the land taken. On this basis, he found the indicated value of the remainder before taking to be $129,690.00. Doiron next determined the value of the remainder after taking by fixing the value of the remaining 5,415 front feet at his unit value of $60.00 for a total of $324,900.00. From this, he deducted development costs of $18.00 per foot or $94,732.-00, producing a value of $230,168.00 for the remainder after taking. Utilizing a 3 year absorption period, Driggers attained the sum of $76,700.00 annually, which, computed at a 10% factor for three years (2.486) produced a value of $190,675.00 for remaining saleable lots. To this, he added $5,000.00, being the value of a certain portion he considered economically unfeasible to develop. In so doing, he found an after value of the remainder of $195,675.00. This resulted in an indicated benefit to the Owner of $65,985.00, the difference between the after value of the remaining land and profit, $195,675.00, and the indicated remainder value of $129,690.00. Because of his finding of indicated benefits from the taking, Doiron allowed no severance damages. His total appraisal of compensation due was $176,600.00, being the discounted value of the property taken.
Kermit Williams, Appraiser, appearing on behalf of Owner, utilized three compa-rables in appraising the 48.8 acre tract at $4,500.00 per acre before the taking, or $219,888.00. He valued Lots 1, 2, 5, 6 and 7, before the taking, at $45.00 per front foot, thus appraising their combined footage of 517.5 feet at $23,287.00, reaching a total before taking worth of $243,175.00. Williams determined the value of the part taken by multiplying the 14,364 acres expropriated by its appraised value of $4,500.00 per acre, producing a figure of $64,638.00. Lots 1 and 2, containing a total of 210 feet, were appraised at $45.00 per foot, or $9,450.00. The parts taken from Lots 5, 6 and 7 were valued at $.21¶! per square foot, or $2,901.00, producing a total appraisal of $76,989.00 for land taken. Subtracting the value of the part taken from the value before taking, he achieved a value of $166,186.00 for the remainder as part of the whole. He appraised the after taking value of the remainder at $2,470.00 per acre for the remaining 34.5 acres in the large portion, and a similar value for the 1.184 acres remaining from Lots 5, 6 and 7, giving the remainder an after taking value of $88,140.00. This produced severance damages of $76,046.00, the difference between the $166,186.00 value of the remainder as part of the whole, and its appraised value after the taking. He therefore found total compensation due in the sum of $155,035.00.
In arriving at his after taking value, Williams did not use an acreage method of appraisal. Instead, he projected the value of the property on the basis of its subdivision and sale as lots both before and after the taking. He did so despite his acknowledgment that the taking rendered a large section of the land subject to the adverse influence of the adjacent Interstate Highway insofar as residential development was concerned. He acknowledged also that a large portion of the remainder was no longer susceptible to development into a quality subdivision at the same land cost. He concluded the taking damaged the *818 property 45% of its before taking $4,500.00 value, or-$2,030.00 an acre, leaving an after taking value of $2,470.00 per acre for the entire remainder. Williams found that before the taking the property could have been subdivided into 125 lots comprising 10,405 front feet which would have produced sales of $728,500.00 in a three year period. He concluded that of this amount, $233,550.00 represented development costs; $219,088.00 represented land costs (48.8 acres at $4,500.00); $72,115.00 would be required for commissions, interest, advertising, etc., leaving a developer’s profit of $202,802.00, or 27.84%. After the taking, he found a total of 80 lots could be developed containing 6,900 front feet which he anticipated would sell in three years for a total of $457,130.00. Allowing the same percentage of profit, or $127,264.00, and also allowing $194,267.00 development costs, and $50,381.00 for interest, advertisement, etc., he found a remainder of $85,218.00, or $2,470.00 per acre for the remaining 34.5 acres. His sales of lots over a three year period were projected on the basis of sales during the first year of lots not directly exposed to I — 10 at $65.00 a front foot; sales during the second year of lots not exposed to I — 10 at $70.00 a front foot, and some lots exposed to I — 10 at $60.-00 per foot, and during the third year sales of lots exposed to I — 10 at a price of $65.00 per front foot. He used no specific com-parables in estimating the front foot retail value of lots which could be developed after the taking.
The trial court rejected Owner’s claim of a developer’s profit on the ground Owner had failed to show: (1) The land was physically capable of being sold as developed lots within a reasonable time, and (2) the existence of a market which would make it possible to sell all developed lots within a reasonable time. The lower court so held upon finding the land was not in fact developed at the time of taking, that there were other subdivisions in the area with available lots on the market, and sales in the area decreased following designation of the route of the project for which this taking was ultimately required years later.
We find no error in the lower court’s rejection of Owner’s contention. We find that in this instance subject property was not in fact an “active subdivision.” There had been no development whatsoever of the land in question for many years, no portions thereof had been sold notwithstanding certain preliminary work had been done looking toward its eventual development. It is also noteworthy that of the 79 lots initially developed in Audubon Terrace, slightly more than 10% remained unsold more than 10 years after sales commenced. It further appears that sales in the general area declined before the present taking. On this basis, we cannot accept Mr. Doiron’s testimony that a new development would sell out completely in six years. We could not accept Mr. Doi-ron’s valuations even assuming his projected sales times proved accurate because his computations did not include taxes or interest a developer would have to pay to finance development costs.
Neither can we accept Mr. Williams’ appraisal as the true indicia of value. His approach depends upon projected sales within an even shorter period than envisioned by Mr. Doi-ron. Under the circumstances, three years seems an unrealistic estimate. In addition, Mr. Williams’ valuations of property selling at as much as $70.00 per foot following the taking is not supported by any data.
As did the trial court, we conclude Mr. Driggers’ method of valuation accords with the applicable rules of law in valuing property expropriated for public purposes. We also conclude that his appraisals appear well founded in reason and produce what we deem a fair valuation of Owner’s property. It is to be further noted that it was at the insistence of counsel for Owner that Mr. Driggers’ appraisal was introduced in evidence.
*819 The judgment of the. trial court is affirmed; all costs of these proceedings to be paid by the Department of Highways, State of Louisiana.
Affirmed.