298 So.2d 859 (1974)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellee-Respondent,
v.
TERRACE LAND COMPANY, INC., Defendant-Appellant-Relator.
No. 54045.
Supreme Court of Louisiana.
June 10, 1974.
Rehearing Denied August 30, 1974.
*860 Victor A. Sachse, Jr., Robert P. Breazeale, Breazeale, Sachse & Wilson, Baton Rouge, for defendant-applicant.
D. Ross Banister, William W. Irwin, Jr., Johnie E. Branch, Jr., Baton Rouge, for plaintiff-respondent.
TATE, Justice.
The plaintiff Department expropriated some fifteen acres of land held by the defendant Terrace for residential subdivision purposes. The court of appeal affirmed the trial court's award. 282 So.2d 814 (La.App. 1st Cir. 1973).
We granted certiorari, 284 So.2d 600 (1973), primarily to clarify the method of determining the compensation to which an owner-developer is entitled when part of land held for subdivision purposes is taken.
The Department contends that the property should be valued on a raw-acreage basis, as if the property were to be sold as one tract by the owner-developer to another developer for his use for re-sale by him of subdivision lots, i. e., at its wholesale value. The landowner Terrace contends that the property should be valued at its value as if sold, as intended, by lot to individual purchasers, i. e., at its retail value.
That is, as the court of appeal stated, 282 So.2d 814: "The sole issue presented is whether an owner-developer of property best suitable for residential subdivision purposes is entitled to be compensated at the retail value of the land taken, including a developer's profit, unless development costs, or at the amount a purchaser-developer would pay for the land on an acreage basis." The effect of the Department's position, if upheld, is to deprive the owner-developer of the development profits of the land owned and being developed for the specific purpose of making such profits.

1.
Based on the raw-acreage value, the previous courts awarded the defendant Terrace *861 a total of $133,240. Terrace, the landowner, contends it should instead be awarded $176,600, based on the per-lot value of the land taken.
The essential facts are undisputed.
The defendant Terrace originally owned a 90-acre tract. In 1958, preliminary approval was obtained of a subdivision layout of this land into 182 lots under the name of the Audubon Terrace Subdivision. The development was to proceed in stages.
In accordance with this plan, pursuant to local governmental regulation, a first filing for construction of Lots 1 through 79 (comprising about 41 acres) was approved and recorded in 1959. The lots and streets of this plat were developed in accordance with it and with the master plan for the entire proposed 90-acre subdivision. The drainage, water, gas, and sewer lines installed were of sufficient capacity and depth to serve not only the initial 79 lots, but also those to be constructed on the 48.8-acre remainder of the tract. With exceptions to be noted, these lots were sold and substantial single-family residences were constructed thereupon prior to the 1970 taking.
In 1959 it was announced that a portion of the right-of-way for the subject taking (for a no-access interstate highway) would be taken from the Terrace Land Company. However, the exact location of the right of way taken was not settled upon until 1966. The present 1970 expropriation suit took a fourteen-acre wedge-shaped slice across the northeast edge of the yet undeveloped portion of the property (including all or part of 47 lots of the intended subdivision), as well as all or part of five unsold lots in the portion of the subdivision included in the 1959 recorded plat.
The evidence is uncontradicted that, after 1959, further development of the unplatted portion of the planned subdivision was not undertaken because of the public announcement of the forthcoming expropriation of part of the property. The developers were, of course, uncertain as to the final location of the right-of-way, and as to its effect upon utilization of any remainder of their tract to be left to them after the taking.
Further, because of this uncertainty, sales slowed following 1967. Nine lots of the first 79 remained unsold at the time of the 1970 taking, of which five were in fact wholly or partially included within the taking. Most of the lots had been sold before 1966, when the present location of the interstate right-of-way had been tentatively decided.

2.
In its scholarly and perceptive brief, the Department contends that the fourteen acres taken should be compensated at its wholesale value, i. e., as if the only willing buyer for them would be another developer who would expect to develop them himself and to make a developer's profit thereupon.
To the contrary, the defendant Terrace points out that it itself had purchased this property for such purpose and was in the process of active development of it to retail it to willing buyers of residential subdivision lots. Therefore, the landowner Terrace contends, it should receive the retail value of these lots (less further costs of development) scheduled to be subdivided from the land taken, since the actual intended market for these lots was to individual lot-purchasers and since the evidence shows it to be reasonably certain that the land would be so sold in lots.
The Department's contention is not frivolous. The Department points out that, to determine the value of the tract taken on a per-lot basis, it is necessary first to determine the selling price of the lots when fully developed, then to subtract the future cost of developing the lots, then to discount the net price so derived on the basis that the lots would not be sold simultaneously but rather over a period of time. Since *862 the usual test of the award in expropriation cases is the market value determined by what a willing buyer would pay a willing seller, the Department suggests that the only buyer ready and willing to buy the entire tract at the time of the taking would be another developer purchasing it as raw-acreage in order to make the developer's profit (i. e., the very purpose for which the present owner-developer was holding and developing the property at the time of the taking.)
The chief decisions of this court relied upon by the Department are: City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445 (1951) (remanded) and 223 La. 1079, 67 So.2d 732 (1953) (on the merits); and Caddo Parish School Board v. Willer, 227 La. 201, 78 So.2d 833 (1955). As the Department admits, however, the present issue was not before the court in the Abe Meyer cases, because all the experts valued the property on a raw-acreage basis for subdivision purposes (the real issue being whether its highest and best value was for subdivision rather than for lesser purposes.) Likewise, the cited Caddo Parish School Board decision does not decide the present issue, since the court found that the per-lot value ($350 per lot) was equivalent to the per-acre value ($1,962) awarded by the trial court on the basis of other comparables. 227 La. 206, 78 So.2d 834.
The Department does, however, find support for its position in some decisions of the courts of appeal it relies upon: State, Department of Highways v. Riley, 143 So.2d 396 (La.App. 3d Cir. 1962), certiorari denied; State, Department of Highways v. Hedweg, Inc., 133 So.2d 180 (La. App. 4th Cir. 1961), certiorari denied. See also State, Department of Highways v. Wolfe, 252 So.2d 483 (La.App. 3d Cir. 1971). Although to some extent factually distinguishable, these decisions essentially hold that an owner-developer should receive compensation for as-yet unsubdivided lots on the basis of their market value as a single tract to a purchaser intending to develop them, rather than on the basis of their value as subdivided lots.
Terrace, the defendant landowner, relies upon an opposing line of court of appeal decisions, which (although likewise to some extent factually distinguishable) essentially hold that an owner-developer should be awarded compensation on the subdivision analysis basis, i. e., on the retail value of the sale of the land in lots to individual purchasers, less to-be-incurred development costs: State, Department of Highways v. Cobb, 169 So.2d 419 (La. App. 3d Cir. 1964); State, Department of Highways v. Brooks, 152 So.2d 637 (La. App. 2d Cir. 1963), certiorari denied 244 La. 663, 153 So.2d 880 (1963); State, Department of Highways v. Barrilleaux, 139 So. 2d 242 (La.App. 1st Cir. 1962); State Department of Highways v. Boyer, 130 So.2d 738 (La.App. 3d Cir. 1961), certiorari denied. See also Dakin and Klein, Eminent Domain in Louisiana, pp. 203-211 (1970).
In our opinion, the latter-cited line of intermediate decisions correctly hold, and the former-cited line of decisions are overruled to the extent they are in conflict therewith, that an owner-developer is entitled to recover on the basis of the individual retail value of each lot (less development costs, but not less the developer's profit) if sold in the ordinary and usual course of business. Of course, as to be noted more fully, this rule applies only where the sale of lots for subdivision purposes is reasonably prospective, and only where the evidence shows that the owner-developer is actually in the process of developing and selling the land as subdivision lots, as compared with merely holding an undeveloped tract for its potential subdivision development.
This conclusion is justified by the mandate of our state constitution that private property shall not be taken unless "just and adequate compensation is paid." La.Const., Art. I, Section 2 (1921). In compliance with this constitutional requirement, "a landowner is entitled to the monetary equivalent of the property taken." *863 State, Department of Highways v. Crow, 286 So.2d 353, 356 (La.1973) and cases therein cited.
The basis purpose in all cases is to determine the just and adequate compensation required by our constitution. Whatever approach or formula of valuation used, it should take into consideration "all factors which lead to a replacement of the loss caused by the taking. This means substantially that the owner is placed in as good a position pecuniarily as he would have been had his property not been taken [Many citations omitted.]" State Through Dept. of Highways v. Ragusa, 234 La. 51, 99 So.2d 20, 21.
The specific formulas of valuation developed by the courts are all designed to assure that the condemnee receives just and adequate compensation. These formulas are all means to this end; there is no artificial formula by which alone such compensation may be determined. Specific formulas of valuationsuch as willing buyer-willing seller, per-acre or per-lot, front-foot or average-value, income-capitalization, replacement-cost, or other should be used to effectuate this end, not to defeat it. State, Department of Highways v. Crow, 286 So.2d 353 (La.1973); State, Department of Highways v. Blair, 285 So.3d 212 (La.1973); State, Department of Highways v. Hoyt, 284 So.2d 763 (La.1973).
Thus, where an owner-developer owns land forming part of a subdivision actually developed and in the process of being sold as individual lots, and where a portion of the tract destined for that use but not actually yet developed is taken, the owner-developer is entitled to receive just and adequate compensation for the tract taken on the basis of the retail value of the lots to individual purchasers (assuming that the evidence shows such sales to be reasonably prospective), rather than artificially limited to a value based upon a hypothetical sale as a single-tract unit to another developer. The owner-developer should not be excluded from the land-profit the evidence shows he was reasonably certain to receive, except that the taking took place.
The owner-developer is entitled to receive as just and adequate compensation the actual pecuniary loss caused by the taking which the evidence shows to be attributable to the loss of the value of the land itself. He should not be deprived of the profit attributable to the retail (as compared with the wholesale) value of the land simply because of some arbitrary formula that bases the market value of the tract, not upon its actually prospective retail sales to lot-purchasers, but instead upon a fictitious, unintended, and unlikely sale of it as a single tract to a non-existing third person who would himself develop and retail the land (and keep the landprofit), just as the owner-developer was in the process of doing.

3.
Nevertheless, as the Department correctly contends, an owner of land is not entitled to recover on the basis of its retail value if sold as lots, simply because the land's highest and best use is for subdivision purposes. The evidence must additionally show that it was reasonably certain that the owner could and would have sold them on such basis, had it not been for the intervening expropriation.
Thus, in Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959), the parish expropriated an entire tract, fronting 100 feet on the highway by a depth of 500 feet and situated between a hospital and a nursing home. It was used as a residence, although the expert testimony showed its highest and best use to be for commercial use fronting the highway. The defendant claimed higher compensation on the basis of the theoretical subdivision of this small plot into a 60-foot roadway down its depth with small 40-foot lots along this unconstructed and expensive roadway.
*864 This court rejected this claim as based upon a use too speculative. In context of these facts must be viewed the court's pronouncements about the measure of compensation being the value of the property as a whole, rather than as the aggregate of the value of the lots, "for so many contingencies may intervene as to make such [latter] measure of compensation too uncertain and conjectural." 116 So.2d 496.
Nevertheless, the essential holding of the decision is that, in determining just and adequate compensation to a landowner, "possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to have no perceptible effect upon present market value should be excluded from consideration." 116 So.2d 496. Thus, awarding a rawacreage rather than a retail-lot value may be appropriate when, at the time of the taking, the subdivision-value of the land is only potential rather than being actually developed for purposes of re-sale by the owner himself at the time of the taking. State, Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964).
The evidence shows that Terrace's tract at the time of the taking was at the edge of suburban development and in the growth path of the City of Baton Rouge. It shows that, except for the period of uncertainty when the proposed construction of the no-access interstate and its tentative location were announced, the demand and sales for the lots planned for the subdivision were reasonably certain. Prior to this uncertainty, all but nine of the 79 lots of the initial filing were readily sold; wellkept homes have been constructed on all of those sold. Nearby subdivisions have experienced similar sales and growth.
The evidence further shows that the 48.8-acre tract, part of which was taken, was being developed as part of a unified subdivision along with the 41-acre tract (Lots 1-79) included within the first filing. Substantial additional expense was incurred in connection with the development of these first-developed lots, in order to accommodate street, gas, water, drainage, and sewerage needs of the as-yet undeveloped portion of the tract intended to be included within the subdivision.
Under this showing, it was shown to be reasonably certain that the owner-developer was in the process of and would have developed and sold the property taken as residential lots. The land taken thus should be valued as part of an active subdivision reasonably certain to be sold as subdivision lots, rather than merely as raw acreage with its highest and best use merely being for potential subdivision purposes.

4.
Under the facts here shown, the previous courts were in error in holding the present tract was not an "active" subdivision on the ground that nine of the lots were unsold and the remaining 48 acres had not been developed at the time of the taking, some ten years after the subdivision had been opened. Both of these factors are directly attributable to actions of the Department.
In 1959 the Department announced that the interstate right-of-way would pass through the Terrace tractin fact, it took all or part of five of the unsold lots, as well as over fourteen acres of the portion of the subdivision planned to be included within the second filing. The announcement of the right-of-way's actual location in 1966 virtually brought sales in the immediate vicinity to a halt.
Had any development been made of the land after announcement of these plans, the Department might have contended that the development was made in bad faith, as it unsuccessfully did in State, Department of Highways v. Vermilion Development *865 Company, 258 La. 1159, 249 So.2d 167 (1971).
We therefore find Terrace placed in this position. Their planned development was halted when the highway department announced that the proposed route of Interstate 10 would require expropriation of at least part of their property. During the interim between 1959 and 1970 the proposed route of the highway was changed at least once, creating additional uncertainty in the minds of Terrace and other landowners in the area. As a result, property values in the area declined, and development ceased. When, in 1970, the Department finally decided to expropriate the property, it had effectively taken out of commerce for eleven years the property of Terrace Land Company taken.
The Department now argues that, since no development had taken place and some lots remain unsold, the subdivision was "inactive", so Terrace is entitled to receive only the wholesale rather than the retail value of their property. We reject this position.
The Department does not dispute the evidence produced by the owner establishing that the subdivision was "active" in 1959. The unified development plan for the entire 90-acre tract, the "superadequacy" of utilities in the developed portion designed for connection with the second filing, the partial clearing of street right-of-ways in the undeveloped portion, and other factors make it abundantly clear that there was an "active" subdivision in 1959, and that the land expropriated was a part of that development.
In view of the eleven-year lag between the announcement of the proposed project and the actual expropriation, as well as of the unsettled jurisprudence as to whether Terrace could proceed with their development at the risk of being relegated to bad faith "salvage value" if the highway department ultimately expropriated newly developed property, we hold that the subdivision was "active" and the owner thus entitled to the retail value of the lots, including a developer's profit.
We therefore find that the defendant Terrace is entitled to receive compensation for the taking on the basis of the retail value of the lots, less the future costs of development.

5.
The trial court awarded a total of $133,240, being the wholesale value of the property taken plus severance damages. The defendant contends that, instead, it is entitled to $176,600, based upon the testimony of its principal expert as to the retail value of the lots (less further development costs).
The testimony of this expert contains detailed calculations by which the total expense of the entire subdivision, including both that portion developed and that undeveloped prior to the 1970 taking, was averaged out and allocated to all of the lots, present and prospective. These development costs[1] gross out at $18 per linear foot for each lot. Based on comparable sales, each lot has a sales value of $60 per front foot, with thus a net retail value of $48.00 per front foot.
As selling expense, the expert also allocated an advertising cost of one-half of one percent of the gross sales price. He was of the opinion that no other overhead costs should be deducted, since the developers themselves supplied their own sales services without retaining salesmen or formal office force. He then arrived at a net aggregate retail value of the lots (being upon their gross selling price, less these costs of development and sale).
*866 However, in the expert's opinion, the most advantageous selling price was obtainable by spacing these sales over six years. Using accepted real estate appraisal techniques, he therefore applied a discount factor in order to arrive at the present cash value of the aggregate net retail value of the lots if the sales were so spaced.
We find only one error in the expert's valuation. The $60 per front foot retail value and the $18 per linear foot development costs are supported by the record. However, in determining the costs of selling these lots, he allowed only one-half of one percent for advertising costs. We think the record justifies a finding of a greater expense to the owners-developers in marketing the lots.
The record as a whole indicates that, in the sale of residential subdivisions, the usual selling costs (including real estate commissions, advertising, and overhead) amount to ten percent of the gross selling price of the lots. Since the record without contradiction indicates that the owners-sellers had sold virtually all of the previous lots themselves and without the aid of real estate agents, and intended to do the same in the orderly marketing of the remainder of their subdivision, we find no error in the expert finding that the six percent salesmen's commission (forming part of the ten percent selling cost) should not be allocated in this particular instance as a prospective expense of the selling of these lots.
Nevertheless, the expert's testimony itself indicates that he did not take into consideration such other overhead costs as annual taxes and the costs of maintaining the vacant lots, such as mowing the grass, until they were sold. Although the developers stated they had no other administrative overhead, since they themselves and their wives supplied the services needed, nevertheless we believe that, in a commercial venture of this nature, such administrative costs should be deducted from the gross selling price; otherwise, the award for the land taken will include compensation for their services in addition to compensation for the value of the land taken.
We therefore conclude that administrative selling expenses (for instance, supervision, taxes, overhead, advertising, maintenance by mowing the grass, etc.) of four percent of the gross selling price of the lots should be deducted as a factor which decreases the net return from the retail sale of the land as subdivision lots, where (as here) the owner-developer himself plans to market any large number of subdivision lots as part of a commercial venture.
Using the same formula as that used by the defendant's expert, but by deducting four percent for administrative selling expenses (instead of only one half of one percent for advertising), we arrive at a net value of $167,715.40 for the land taken.
The expert concluded that the severance damages in the remainder of the subdivision were outweighed by the benefits received. Both parties accept this conclusion as proper in this instance if (as we hold) the subdivision analysis method of valuation is here appropriate.
The landowner is thus entitled to receive an award of $34,473.40 additional to that made by the previous courts.

6.
The present taking was made in 1970, after the enactment of Act 315 of 1970. This statute amended Civil Code Articles 1938 and 2924 so as to increase the legal rate of interest from five to seven percent, and it also repealed all laws in conflict therewith.
The taking was made under the highway quick-taking enactment. This legislation provides, in La.R.S. 48:455 (1954), that an *867 expropriation judgment shall include, "as part of the just compensation awarded, interest at the rate of five per centum per annum on the amount finally awarded as of the date title vests in the plaintiff to the date of payment * * *." (Italics ours.) Five percent was also the rate of legal interest at the time this statute was enacted. See Civil Code Articles 1938 and 2924 prior to the 1970 amendments.
The courts of appeal have correctly held that the 1970 amendment of Civil Code Article 1938, repealing all laws contrary thereto, was intended to increase the rate of legal interest from five to seven per cent in La.R.S. 48:455 and similar statutes. State, Department of Highways v. Mertens, 271 So.2d 280 (La.App. 3d Cir. 1972); State, Department of Highways v. Wahlder, 271 So.2d 284 (La.App. 3d Cir. 1972), certiorari denied, 273 So.2d 847 (La.1973).
Interest is due as damages in the performance of an obligation to pay money. Civil Code Article 1935. As amended in 1970, Civil Code Article 1938 provides: "All debts shall bear interest at the rate of seven per centum per annum from the time they become due, unless otherwise stipulated." Considering also the part of the amending statute which repealed all laws in conflict therewith, the legislative intent reasonably ascribed is to increases the legal rate of interest recoverable in expropriation proceedings also; for no sound reason is advanced why the legislature would have intended to permit paying landowners (who are constitutionally entitled to just and equal compensation) a lesser rate of interest for land taken from them by the state, than that paid to other creditors to whom debts are owed.

Decree
For the reasons assigned, therefore, we increase the award of the trial court from one hundred thirty-three thousand two hundred forty and no/100 ($133,240.00) dollars to one hundred sixty-seven, seven hundred fifteen and 40/100 ($167,715.40) dollars, with interest at the rate of seven (7%) percent per annum from date of the taking until paid on the additional thirty-four thousand, four hundred seventy-five and 40/100 ($34,475.40) dollars now awarded by this court. The plaintiff Department is taxed with all costs of these proceedings.
Amended and affirmed.
MARCUS, J., dissents with written reasons.
MARCUS, Justice (dissenting).
I disagree with the majority opinion in its holding that the owner-developer is entitled to recover on the basis of the individual retail value of each lot (less development costs, but not less the developer's profit). I disagree with the inclusion of the developer's anticipated profit as part of just and adequate compensation. Under the law, defendant landowner is entitled to market value of the land taken, that is, the price which would be agreed upon by a willing and informed buyer and seller under usual and ordinary circumstances and in the condition the land stood as of the date of the expropriation proceeding. Market value does not mean speculative or remote value. The owner's plans and hopes for the future are irrelevant. Thus, I do not consider it proper to include the owner-developer's potential profit as part of the compensation awarded for the taking of this tract of land.
I respectfully dissent.
NOTES
[1] Engineering costs, and costs of construction, sewerage, sidewalks, curbs, streets, drainage, and water and gas lines.