301 So.2d 915 (1974)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
Alice Duhon Hock ANSELMO et al.
No. 6265.
Court of Appeal of Louisiana, Fourth Circuit.
September 10, 1974.
Rehearing Denied October 16, 1974.
Writ Refused December 13, 1974.
*916 D. Ross Banister, William W. Irwin, Jr., Jerry F. Davis, Johnie E. Branch, Jr., Baton Rouge, for plaintiff-appellant.
*917 David L. Stone (Stone, Pigman, Walther, Wittmann & Hutchinson), New Orleans, for defendants-appellees.
Before REDMANN and GULOTTA, JJ., and MARCEL, J. Pro Tem.
REDMANN, Judge.
By this appeal the Department of Highways seeks reduction of an award in a partial taking of land and a building. The trial judge based the award on three elements: the building destroyed, the land taken, and the severance damage to the remaining land. Highways' appeal seeks reduction of each element of the award. The owner's answer seeks increase in the severance element.
We affirm as to the building and reduce as to land taken and severance damages.
In the square bounded by Tulane, Claiborne and Cleveland avenues and Robertson street in New Orleans, defendant owned five lots forming a roughly L-shaped tract. Three of the lots fronted a total of 76 feet on Claiborne (beginning 150 from Cleveland) and the other two lots fronted 53 feet on Cleveland (beginning 111 from Claiborne).
Highways expropriated defendant's Claiborne frontage to a depth of approximately 62 feet to construct a ramp from Tulane to the elevated Interstate 10. This expropriation prompted demolition of a building that occupied most of the three lots facing Claiborne and a rear portion of one of the lots facing Cleveland. The two Cleveland lots remained untouched, but they as well as the rear portion of the Claiborne lots are now denied access to Claiborne.
Both parties evaluated building and land separately, and we therefore do the same.[1]

BUILDING
Highways argues the trial judge erred in awarding $80,000 for the building because no expert opinion fixed that value. Highways asks that we adopt its experts' pretrial opinions of replacement cost and depreciation.
This argument errs in assuming that the trial judge's function is merely to decide which party's appraiser has best fixed just and adequate compensation. Rather, the judge must himself fix proper compensation, and the appraisers' testimony is intended to help him to do so.
The judge's $80,000 valuation is a reasonable approximation based on the owner's estimates of building cost and depreciation.

Building Cost
Highways' cost expert, after making adjustments during trial, differed little with the owner's expert on cost estimates. Highways' expert conceded the reasonableness of most of the owner's calculations.
The owner's expert included the cost of proper air conditioning and proper electrical servicing (including proper lighting fixtures). He provided evidence of the cost of constructing the building as one should construct it, and he did not allow for circumstances in the building as it existed.
Proper cooling of all office-type area would require an $11,000 cost, according to the owner's expert, who estimated $2 a square foot for 5,500 square feet. But according to the uncontradicted factual testimony of Highways' contractor, there was only one ten-ton air conditioning unit, and part of the office-type area was not air conditioned. The replacement of the actual ten tons of cooling (including ducts, *918 etc.), Highways' contractor testified, would only cost $6,000 at the time of taking. The trial judge might therefore reasonably have disallowed $5,000 of the owner's replacement cost estimate.
Proper electrical wiring and lighting would cost $12,000, the owner's expert testified. But lighting fixtures had been removed, both experts agreed. Highways' expert testified there remained a minimal number of fixtures. Just and adequate compensation does not include payment for fixtures a building does not have. The trial court need not have accepted Highways' expert's estimate of $7,200, but it is the owner's burden to prove excess value and the owner's expert's testimony did not separate the value of the fixtures. Thus his $12,000 total estimate could not be used. The trial judge could reasonably have accepted Highways' estimate and reduced the owner's cost estimate by an additional $4,800 for this item.
Highways also complains of the owner's estimates on plumbing cost. The owner's expert testified he assumed there were roof drains because there had to be. Highways' expert testified only that the roof was a type that "would not" have drains. This was a conflict of theory against theory, and not against factual testimony. The trial judge could reasonably have accepted the owner's cost estimate on this item.
The trial judge accordingly could have reduced the owner's estimate by $9,800 from the labor-material cost of $96,293 to $86,493. This would be increased by the factors, said by Highways' expert to be reasonable, of 10% overhead to $95,142.30, plus 10% profit to $104,656.53. A 10% allowance for architectural etc. fees would bring the full cost of a similar new building as of the taking to $115,122.18. Yet there was also factual testimony of loose floor tiling and other unfinished areas, which would justify estimating replacement cost at slightly less than $115,000.

Depreciation
Constructed in one form and partially reconstructed by a sizeable addition, the building had fallen from its intended use as a new automobile dealership to use as an automobile body and paint shop.
Highways would use a 5% annual straight-line depreciation rate on the theory that, despite a longer physical life, the economic life of this particular building was only 20 years, by which time it would be so unsuited to the highest and best use of business district land that a prudent owner would demolish it. The 5% rate would depreciate the building by 50%, since it was ten years old (though the addition was only seven years old).
One of the owner's experts opined that part of the addition "did not add any functional utility to the building so I had to penalize it". That expert therefore deducted 30% of the original cost of the original portion of the building for "functional obsolescence". His total for depreciation and obsolescence, $42,784.26, was calculated on the original, not the replacement cost, and amounted to 39.4% of the total original cost. The error in depreciating original rather than replacement cost is that remaining life is to be recompensed on the basis of replacement cost. A building which has only 70% of its useful life remaining is only worth 70% of its replacement cost, and therefore the 30% depreciation for the years past must be 30% of its replacement cost (and not of its ordinarily lower original cost).
However, this expert's overall 39.4% amount included, in addition to two differing physical depreciation factors, an obsolescence factor which cannot be related precisely to the new construction, because the new was not an exact duplication of the originally unintended two-stage construction (which necessarily had extra costs).
The owner's other expert, considering the different ages of the two parts of the *919 building, would depreciate the entire building by 30%.
We conclude that the trial judge could appropriately apply a 30% depreciation factor.
Applying 30% to our estimated $115,000 replacement cost would reduce it to $80,500. There was ample room for a $500 further reduction of depreciated building cost in evidence of floor tiles being loose and certain areas being in fact unfinished, or in need of some painting, etc.
The trial judge's $80,000 award for the building is affirmed.

LAND
The basic aim of payment for property "taken or damaged" is "just and adequate compensation", La.Const. art. 1 § 2. "The specific formulas of valuation developed by the courts are all designed to insure that the condemnee receives just and adequate compensation.... [T]here is no artificial formula by which alone such compensation may be determined." State, Dept. Hwys. v. Terrace Land Co., Inc., La.1974, 298 So.2d 859, 863. See also State, Dept. Hwys. v. Crow, La. 1973, 286 So.2d 353.
Highways complains of one appraiser's evaluating the Claiborne lots and the Cleveland lots separately, although Highways' own appraiser testified he at first used the same procedure. We find the separate valuation by separate comparison with other sales reasonable. Comparison of a nearby Cleveland lot to our Cleveland lots without much adjustment seems wholly logical, while an adjustment for the superior street frontage seems more precisely applicable to the Claiborne lots considered by themselves. A plottage increment, including two-street access value, estimated by expert testimony, may mathematically be applied to either the two parts or the whole with identical result.
However, we find some views of the owner's experts inconsistent with the evidence and adjustment principles they asserted, and we therefore conclude it was error to adopt their valuations.
One example of inconsistency with the evidence was the treatment of two properties, used as comparables, which adjoined each other and sold at the same time to the same buyer. One was a 30' by 100' corner lot, and the second was the L-shaped tract of four lots which framed that corner (being three 30' by 100' lots on one side and one 30' by 120' lot on the other side). The assembled four lots sold for 10% less a square foot than the corner lot. In the absence of any other explanation, those sales demonstrate that, whatever the plottage increment in value (over a single inside lot) due to the large size and utility of the four interior lots with two-street access, the increment due to being the corner lot was not merely equal to that plottage increment, but added an overall 10% more to the corner value. One of the owner's experts would treat the corner sale as basically equal to the subject propertythough reciting the corner's 10% advantageby equating our L-shaped five-lot tract's plottage increment to the corner lot's corner increment. This equating of increments is proved unreasonable by the contemporaneous corner and four-lot sales (although a much smaller increment for five-lot over four-lot plottage might have been justified).
An example of inconsistency with adjustment principle is the adding of 10% plottage to the Cleveland lots' value for size and two-street access in fixing before-taking value, while finding over 50% loss by the loss of that plottage in fixing after-taking value. If plottage only increased value by 10%, loss of plottage can only decrease value by 10% (although other factors might cause further decrease in value).
We disregard altogether the owner's experts' unhelpful references to two leases. One expert, who stated a 6% annual value *920 increment principle, would take a 65-year lease and capitalize average annual rent for the whole 65-year term. This method of reaching a high present value assumes that the property value today is the same as the value will be 65 years hence. But in 65 years this expert's 6% time factoreven without compounding itwould make the land value 490% of its present value. Compounding the 6% increment would make the land then worth 4400%[2] of its present value according to R.S. 47:2405's 6% table. If average annual rental is 8% of today's value, it would be less than 1/5% of value 65 years hence. In the absence of some rational explanation of an owner's accepting 1/5% as rental, we cannot accept the theory that he did so in the 65-year lease. The valuation theory based on average rental is inconsistent with the theory that land increases in dollar-value. The valuation theory is therefore rejected.
We now examine the comparable sales.

Before-Taking Value
In September 1963, a 15' by 106' lot on Cleveland in the adjacent square (which had Canal street on its opposite side) sold at $8.48 a square foot. In April 1964, a 27' by 106' lot adjoining that lot sold for $12.84 a square foot.[3]
In March 1964 the corner of Claiborne and Cleveland, in the same square as the subject property, sold for $6.16 a square foot. This corner comprised three lots forming an L-shape, 31' on Claiborne by 111' on Cleveland with an added 44' × 60' interior rear portion. It was next to our property on Cleveland and 115' from it on Claiborne.
Thus the inside lot in the Canal street square sold for 208% of the corner lot in the Tulane square in which the subject property lies.
We next observe that corner lots are more valuable than inside lots. In late 1965, two comparable sales to one buyer occurred in another adjacent square. One was of a corner lot (Cleveland and Robertson) alone; the other was of four lots, three next to that corner on Cleveland and one next to it on Robertson. The corner lot brought $13.33 a square foot; the L-shaped group of four inside lots brought only $12.00. Those lots totalled four times the area of the corner, but they sold for 10% less per square foot.
Our subject lots also total about four times the area of their nearby corner, which sold for $6.16 about two and a half years prior to the taking. The owner's first expert did not use the March 26, 1964 same-square corner sale at $6.16, but used instead the April 30, 1964 Canal square inside lot sale at $16.51 (without adjustment for sound value of improvements), diminished by only 20% for the subject's having no Canal street influence, and increased by 10% because the subject has a plottage benefit of larger size and two-street access. This expert would conclude from the Canal square sale that our Claiborne lots have an indicated value of $17.34. But his 6% time factor would have made the adjoining corner property in our square worth only $7.08 ($6.16 increased by 15% for time); and the subject non-corner assemblage would be worth even less. If the $6.16 corner is not a good comparable, the $12.84 (or $16.51) Canal property is less so.
*921 The owner's second expert would similarly use the $16.51 Canal square figure, rather than the $6.16 corner property in the subject square, to indicate a $16.00 overall value for the subject (both Claiborne and Cleveland frontages).
One evident and admitted explanation of higher Canal square value is "world-famous" Canal street. No explanation was given for the total disregard of the $6.16 sale, and we deem it unreasonable and untenable to assert that the Canal square sale shows a $16 or higher value of inside lots in another square whose own corner sale (at about the same time as the Canal sale) would indicate a value of $7.08 (or even as little as $6.37, if, as in the case of the comparables at the nearby corner, the inside assemblage is worth 10% less than the corner).
Next in time, of the sales we consider,[4] were two in September and October 1965. We have already discussed these sales in other contexts.
These were sales to the City of New Orleans for a fire engine station in the adjacent square across Robertson street (a block closer to the heart of the main business district). The city bought an L-shaped tract of four lots framing the corner lot in one sale and then the corner lot in a second sale. It paid $13.33 a square foot for the corner lot and exactly 10% less, $12, for the four non-corner lots.
The owner's first expert concluded the corner factor was a 10% advantage, but he eliminated this advantage by awarding the subject property 10% for plottage. We deem the opinion, that plottage increment was equal to corner increment, unacceptable in the face of the contemporary sale of the corner's four adjacent lots at $12. The corner sold for 10% more than the adjacent assemblage of four lots, proving that, whatever the value increment due to plottage, the corner increment not only offset the plottage but was worth an additional 10%.
The conclusion is almost self-assertive that each of these $12 and $13.33 sales (at the same time for the same purpose to the same buyer) has the same probative effect as the other. The corner value must first be reduced by its corner increment (since the subject is not a corner) and thus other calculations must begin from the same $12 base non-corner value (which already includes plottage value for the four-lot size and two-street access).
One of plaintiff's experts added 6% for the passage of a year since the comparable sale. The second did not expressly make this adjustment. Highways' expert had not adjusted for time (he would have used a 5% rate) because the sale had been "less than a year" earlier when he first appraised, prior to suit. We conclude a just and adequate evaluation would allow a time adjustment, and the evidence supports a 6% rate. This time adjustment brings the comparable's own value, as of the taking, to $12.72.
*922 The owner's first expert would add 25% to this figure[5] for the Claiborne lots, because Claiborne-front property was worth, in his opinion, 25% more than Cleveland or Robertson property.
The owner's second expert would add 15% to the entire subject (both Claiborne and Cleveland lots) for "location" in the Claiborne square.
Such substantial premiums for Claiborne frontage are directly contradicted by the $6.16 Claiborne corner sale time-adjusted to $7.08, and indirectly contradicted by the $8.48 and $12.84 Canal square sales time-adjusted to $9.81 and $14.77.
These high premiums for Claiborne are also inconsistent with two sales of Claiborne frontage in the subject square at $13.50, to Highways for the same ramp. One of the owner's experts would disregard one of these because the lots were shallow, and "didn't give any weight" to the second sale because it was to Highways, which has expropriation power, and "I don't know whether [Highways] had an informed seller." Presumably his view was that the sale was under market price. Yet the sales to the city for a fire station were also to a buyer with expropriation power and, although Highways' expert thought a price slightly over market might have been paid (as our earlier comparables might suggest), the sales to the city were used as comparables.
The circumstance that a purchaser has expropriation power does not by itself justify any inference that the price is either above or below market. If we were to disregard these $13.50 sales we ought on the same reasoning to disregard the sales to the city, which all experts used as comparables. If the sales to the city are unobjectionable as reliable value indicators, so are the sales to Highways. The latter sales are further evidence that Claiborne frontage does not enjoy a 25% advantage over the comparable bought by the city, and that the entire subject property (including Cleveland portions also) does not enjoy a 15% advantage.
These high premiums for Claiborne must be rejected as unsupported except to the extent of $13.50, which the Claiborne sales to Highways justify for the subject's Claiborne frontage.
However, the $13.50 Claiborne sales to Highways do not include any increment for two-street access. Despite the subject's irregularity of a narrowing to 40 feet in one part of the Cleveland lots, the preponderance of the evidence is that the combination of two-street access and size advantage over individual lots gave a total plottage increment of 10%. Although there is no great size advantage (one $13.50 Claiborne sale also had a 75' frontage), we conclude that the Claiborne $13.50 value should be increased for the subject's two-street access by 5%, bringing it to $14.18 for our Claiborne lots.
The Cleveland lots' value, including plottage, is equal to the $12.72 of the city-purchased four-lot comparable with two-street advantage.
The before-taking value would thus include $154,252.88 for 10,878.2 square feet of Claiborne lots and $114,303.92 for 8,996.1 sq. ft. of Cleveland lots, totalling $268,556.80 for the whole 19,874.3 sq. ft. (or an average square foot value of $13.51).

Land Taken
We therefore fix the value of the Claiborne portion taken4,723.5 sq. ft. at *923 $14.18at $66,979.23 rather than the trial court's $80,300.

After-Taking Value
We agree with the owner's legal position that, for purposes of determining the amount by which the remainder of a tract has been damaged by a partial taking, the after-taking value of the remainder must be determined as of immediately after the taking, and not as of the date of trial; State, Dept. Hwys. v. William T. Burton Ind. Inc., La.App.1969, 219 So.2d 837, writ refused, 254 La. 14, 222 So.2d 67; see also Tate, Legal Criteria of Damages and BenefitsThe Measurement of Taking-Caused Damages to Untaken Property, 1971, 31 La.L.Rev. 431, 443. A contrary interpretation of R.S. 48:453's language could not meet state constitutional requirements for prior payment of just and adequate compensation.
We disagree with the owner's factual position that, of his two experts, the one who asserted he estimated value as of immediately after the taking gave the only proper evidence of after-value. There was other evidence indicative of after-value, such as sales within a year after the taking (including a sale of land adjoining the expressway ramp right-of-way in an adjacent square).
The owner's first expertwhose valuation the owner urges should be adoptedasserted he made his valuation as of immediately after the taking, by basing it exclusively on rental income, seen with trial-time hindsight as the rent actually produced during the intervening six years: a buyer immediately after the taking who foresaw several years of low rent would pay a low price. This first expert capitalized that low rent (from leases to a construction company and then to an automobile parking lot operator) to indicate an actual value of $4 a square foot. He then allowed $2 for speculative value, making his final estimate $6.
We recognize that "even when comparable sales are available, courts are free to consider income studies if, on the facts of the case, these studies provide a substantial aid in evaluation." Crow, supra, 286 So.2d at 356-357. But in Crow the income of a favorably-located gasoline station indicated a higher value than comparable sales. One of "the facts of the case" before us is that some land in this immediate area was used for parking prior to the taking, presumably at similar low rentals. If one of these parking lots had been expropriated, it would be patently unjust to award a lower value than that shown by comparable sales, on the theory that Crow authorizes income evaluation even when the market value shown by comparables is higher.
Another of our "facts of the case" is that there developed, after the taking, a proposal for the Health Education Authority of Louisiana to construct a medical complex in this area (already adjacent to the giant state hospital and L.S.U. and Tulane medical schools). There also occurred a decision to build the colossal Louisiana Superdome (now nearly completed) two or three blocks away from this square. These circumstances are cited not as increasing value, but as contributing to this square's continued temporary usage as parking area during a six-year period.
We find no evidence that the expressway ramp project destroyed part of a valuable commercial square by making it unsuitable for any use other than parking, with a real value of only $4 increased for speculation to $6 a square foot.
The evidence is to the contrary. A small Robertson street lot in this square sold in September 1967 at $9.65 a square foot. This price is not rejected by any expert as affected by Health Authority or Superdome intentions. Thus this lot should have been worth $9.10 a year earlier, immediately after the taking, in order *924 for a 6% time increment to bring it to its $9.65 sale price.[6]
(A sale across Robertson street a year and a half later at $9.82 would indicate a somewhat lower value, when adjusted for time. But it would be manifestly unjust, and result in over-compensation, to fix before-value on the basis of the highest adjusted comparable value, and after-value on the lowestjust as it would be unjust to fix before-value on the lowest basis, and after-value on the highest.)
Similarly contrary to the owner's contention that the expressway ramp disastrously reduced property value was a sale across Cleveland, of property adjoining the ramp right-of-way in the Canal street square, a month and a half after our taking, at $15. Reduced by .75% for time, this price would indicate a $14.89 value immediately after the taking, when our $12.84 before-taking comparable would have indicated a then value of about $15.51. The property sold was thrice the size of the Canal square comparable which sold in April 1964 for $12.84, which, adjusted by 15% for time, would equal $14.77 as of taking. The after-taking comparable should have had about a 5% price advantage for its size over the 1964 comparable, indicating a $15.51 value. Therefore a $.62 or 4% loss is indicated, and this loss might be attributed to the ramp. (If we had accepted $16.51 as the 1964 comparable's value, the loss would still amount to only 21%.)
We have earlier found a $9.10 value on a Robertson street lot in our square immediately after our taking. In our judgment $9.10 ought in fairness to be used as an approximation of our Cleveland value immediately after taking (just as the $12.72 Robertson and Cleveland values were used as our Cleveland before-taking value). This value would indicate a loss of about 28% for Cleveland, including the loss of its plottage of about 10% for size and second-street access.
We treat the Claiborne remainder as equivalent in value to the Cleveland lots. None of the Claiborne remainder became landlocked, precisely because of its former two-street access advantage. That part of the Claiborne remainder (48.3' by 76') falling outside the Cleveland side line extension might, in our lay opinion, be worth less per square foot than the Cleveland lots themselves. However, none of the three experts differentiated between this part and the balance of the remainder, and the presence of additional square footage was said (as to before-taking values including comparables) to increase overall value. We conclude the overall value of the 15,150.8 sq. ft. remainder is $9.10 a square foot or a total of $137,872.28.

Severance
Subtracting the $137,872.28 after-value from the remainder's before-value of $201,577.47 (total before-value of $268,556.80 less $66,979.23 awarded for land taken) gives severance damages of $63,705.19 instead of the $81,470 awarded by the trial judge.

DECREE
The judgment is amended to reduce its principal award to $210,684.42 (subject to credit for the $162,650 deposit) and is otherwise affirmed.
NOTES
[1] But see Texas Pac.-M. P. Term. R. Co. v. Rouprich, 1928, 166 La. 352, 117 So. 276. Land should be valued according to its highest and best use. State, Dept. Hwys. v. Hoyt, La. 1973, 284 So.2d 763; yet the building upon the land might not be suitable to that use and therefore might not be worth (on that land) its replacement cost less depreciation for age.
[2] This mathematical conclusion suggests that 6% may be an overstatement. However, we deal only with periods of a month or two to a few years, and the uncompounded 6% does not amount to a substantial change in our calculation hereafter.
[3] Of its $45,000 price, $35,000 is ascribed to land and $10,000 to improvements in arriving at $12.84 land value. The owner's second expert testified $10,000 was the "sound depreciated value" of the frame dwelling. Yet both of the owner's experts would attempt to eliminate the dwelling and assign $16.51 as pure land value, despite this "sound depreciated value". In our judgment the half-year earlier $8.48 sale confirms that the second sale included some payment for the improvements, and requires acceptance of the owner's second expert's estimate of $10,000 for the improvements and the consequent $12.84 pure land value for the second sale.
[4] One of the owner's experts used a June 1964 sale eight or ten blocks away and nearer to the heart of the main business district. This tract was rectangular, having 95' front on each of Loyola and Rampart, by 135' depth running straight through its square. It sold at $16.20. While the expert opined Claiborne was more valuable and therefore worth $17.80, this sale is not readily acceptable as comparable (especially in view of the March 1964 Claiborne corner sale for $6.16). Because several other, much closer sales were available, we conclude this sale does not offer significant evidence of our property's value. One 1960 sale used by Highway's expert was across Claiborne though (judging from a map in evidence) less than a fourth as far from Tulane avenue as the subject. It measured 52' by 106' and sold at $11.82. Because the purchaser, an adjacent motel, needed this adjoining property, this expert would treat the sale as not one by a willing seller to a willing buyer. He would, however, find an indication of a $13.37 overall value for our subject. One of the owner's experts thought this property not comparable because of a zoning difference, and we agree that lying only one lot removed from Tulane gave it added value. It may, nevertheless, suggest a higher value than the comparables previously discussed in the text.
[5] He actually computed 6% plus 25% as indicating a total 31% increase. Elsewhere similar mistaken computations by him and Highways' expert occurred. Any valid time increment increases the comparable's own value (here, from 100% of value to 106%). Then, if the subject is worth 25% more than the comparable, the increment is 25% of the already increased value. Since 25% of 106% is 26.5%, the total increment would have been 32.5%.
[6] The fire-station $12.00 comparable, reduced by 10% for size and two-street plottage, would suggest a $10.80 value for a single lot on Robertson or Cleveland as of September 1965. Increasing 12% for time until September 1967 would indicate an $11.10 value. Thus the Robertson sale at that time for $9.65 was for 13% less than might have been anticipated.