**HARBOR MARINE CORPORATION**

v.

**Roy BRIEHLER d/b/a Ferry Boat Inn and Restaurant**

v.

**Robert W. SUTTON, Jr.**

**No. 80–438–Appeal.**

Supreme Court of Rhode Island.

May 13, 1983.

Roy Briehler, pro se.

Kathleen Managhan, Newport, for third-party defendant.

## OPINION

**BEVILACQUA, Chief Justice.**

This is a civil action brought by the plaintiff, Harbor Marine Corporation, against Roy Briehler d/b/a Ferry Boat Inn and Restaurant, a party defendant, seeking to recover payment of $2,975.75 for work done in demolishing and removing the deteriorated portion of an A-frame and a collapsed ramp. The defendant, Briehler, interpleaded the town of Jamestown, the lessor of the premises, as a third party, claiming that the town was responsible for the work done.

Prior to trial, Briehler submitted to a judgment in favor of Harbor Marine in the sum of $2,975.75, thereby leaving as party litigants Briehler and the town of Jamestown.

The case was heard before a trial justice of the Superior Court sitting without a jury. After hearing all the evidence, the trial justice rendered a decision for third-party plaintiff Briehler. Judgment was entered in the sum of $2,975.75. The defendant, the town of Jamestown (the town), appeals.

In 1970, the State of Rhode Island leased the South Slip in Jamestown to the town at the rate of $1 per year as a boating facility. Under the terms of the lease, the town agreed to construct, use, or maintain the premises as a boating facility at its own expense in a manner satisfactory to the state; to pay all costs of construction; to provide insurance satisfactory to the state; to hold the state harmless and to indemnify the state from any loss arising from the use of these premises; and at the termination of the lease, to return the premises to the state restored to its condition at the time of the letting or in its improved condition, without any expense to the State of Rhode Island.

Shortly thereafter, the town invited Briehler to move his ferry boat to the south slip. In 1971, the town entered a twenty-five year lease agreement with Briehler which was drafted by the town and accepted by the State of Rhode Island.

The lease provided Briehler with the ferry slip known as the South Slip situated at Ferry Wharf, "[i]ncluding the water area, pilings, apron, loading ramp, mechanical and electrical devices, used and useful in connection therewith, together with the right to install and maintain mooring devices, floats and loading ramps from said slip in connection with the docking of a ferry boat in that slip."

The only obligation Briehler assumed regarding repairs under the lease was paragraph 4(c), which provided for the lessee to "maintain and keep in good repair the mechanical and electrical devices.   * * *"

At the time of the lease to Briehler there existed what was referred to in testimony as an A-frame. This consisted of columns of pilings on each side of what used to be the ferry loading ramp and a cross beam between those two pilings forming an entrance. Suspended from this structure was

the movable ferry ramp that formerly serviced the ferry to Newport. The cables and wheel winches which raised and lowered that ramp were attached to the side of the pilings. This mechanism was inoperable at the time of the lease because it had been secured and was immovable.

Briehler used the slip to moor a ferry boat he had converted into a motel-restaurant. His own loading ramp was laid on the fixed ramp so that his patrons had access to the motel-restaurant.

The A-frame and the ramp, due to the passage of time, the elements, and complete absence of any maintenance measures, disintegrated and rotted. The wheel and cable which had been fixed rigid prior to the lease collapsed. Prior to this, the town council had advised Briehler that an inspection of the premises disclosed that it was in dangerous condition. Briehler was told that he was liable for repairs under the lease and had thirty days in which to submit a plan of repair. Meanwhile, Briehler was ordered to stop traffic on the ramp. At a special council meeting, the council notified Briehler that the area would be posted closed and could not be used until satisfactory repairs were made. Faced with the closure of his business with a holiday weekend approaching, Briehler arranged to have the repairs done.

Harbor Marine Corporation did the work at a cost of $2,975.75. The work consisted of removing the A-frame and installing a new fixed ramp.

The trial justice found that the A-frame was not a mechanical or electrical device. He stated further that the only mechanical device that the lease could refer to would be the raising and lowering device for the ferry ramp. This had been made fixed and inoperable by the state or town before Briehler's lease began. Thus, the A-frame was the property of the state and the state's lessee was obligated under its lease to repair and maintain it. We agree.

The sole question before us is whether or not the language contained in the lease "to maintain and keep in good repair the mechanical and electrical devices and to police the leased area * * *'" made the lessee responsible for removal of a structure which was not a mechanical or electrical device.

The town argues that the language of the lease imposing on the lessee, Briehler, the responsibility for repairing and maintaining the electrical and mechanical devices should be broadly interpreted. The town suggests that the provision requiring Briehler to "police the leased area" places the obligation to maintain the premises on the lessee. The town claims that had he properly maintained the ferry slip, all damage would have been prevented.

■ In construing a lease, the intention of the parties must be ascertained from the language employed in the lease. See Humble Oil & Refining Co. v. Lennon, 94 R.I. 509, 514, 182 A.2d 306, 309 (1962).

■ Generally, in the absence of statute or controlling convenant, a lessor is not under a duty to maintain the leased premises in a state of repair. Ferro v. Ferrante, 103 R.I. 680, 686, 240 A.2d 722, 726 (1968). Where, however, a lessee covenants to make repairs which are limited in nature or extent, the covenant will be construed to extend only to repairs of the kind stipulated. See Getter v. Jad Operating Co. 157 N.Y. S.2d 213, 215 (1956). Thus, an express covenant to repair will not be broadened by judicial construction. Rather, where the parties to a lease have expressly covenanted regarding repairs, the express covenant replaces any implied covenant and becomes the measure of liability of the respective parties. Kaufman v. Shoe Corp. of America, 24 Ill.App.2d 431, 435, 164 N.E.2d 617, 620 (1960).

We must, therefore, look to the express language in the lease concerning repairs to determine liability as between the parties.

■ Where a provision of a lease is unambiguous, there is generally no room for interpretation or judicial construction. Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J.Super. 416, 421, 274 A.2d 59,

62 (1971). If there is any doubt as to the meaning of a provision, it should be construed against the drafting party. *A.C. Beals Co. v. Rhode Island Hospital,* 110 R.I. 275, 287, 292 A.2d 865, 872 (1972).

It is well-settled that the findings of a trial justice sitting without a jury are entitled to great weight and will not be overturned on appeal unless such findings are clearly wrong or the trial justice misconceived or overlooked material evidence. *Raheb v. Lemenski,* 115 R.I. 576, 579, 350 A.2d 397, 399 (1976). After an examination of the pertinent lease provisions, we conclude that the trial justice did not misconceive or overlook material evidence, nor was he clearly wrong. The language in the lease is not ambiguous. It clearly states *"mechanical and electrical devices."* There is no room for construction. The stationary pilings of the A-frame cannot be considered a mechanical or electrical device. In addition, the once-movable ferry ramp was inoperable before Briehler's lease began. Thus, the repair provision of Briehler's lease cannot be construed as encompassing the obligation for the work done by Harbor Marine.

Generally, a sublessee cannot ordinarily sue for a breach of his sublessor's covenant to repair contained in the original lease. Rather, the sublessee's obligations are governed by the covenants contained in the sublease. *See Clancy v. Byrne,* 56 N.Y. 129, 136 (1874). Since, under Briehler's lease he was not responsible for the repair work done, the trial justice properly concluded that it was the town's obligation under its lease with the state.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

SHEA, J., did not participate.