**OCEAN ROAD PARTNERS et al.**

v.

**STATE of Rhode Island et al.**

**No. 94–51–Appeal.**

Supreme Court of Rhode Island.

Feb. 7, 1996.

Thomas C. Angelone, Providence, Paul Bogosian, Jr., Cranston, for Plaintiff.

Joseph Larisa, Jr., Harris Weiner, Providence, Julie Tamuleviz, Washington, DC, for Defendant.

## OPINION

LEDERBERG, Justice.

Following the condemnation of its land by the State of Rhode Island (state), Ocean Road Partners, a business partnership, petitioned the Superior Court for an assessment of damages. Ocean Road Partners has appealed to the Supreme Court the resulting assessment of damages made by the Superior Court. In addition, the state has cross-appealed the denial of its motion for reimbursement to the state of the amount of its past payment to the partnership that exceeded the Superior Court's assessment of damages. For the reasons stated below, we deny the appeal of Ocean Road Partners, we sustain the state's cross-appeal, and we modify the judgment of the Superior Court. A summary of the pertinent facts and travel of this case follows. Other facts relevant to the issues on appeal will be added as necessary.

### Facts and Procedural History

On November 9, 1984, Ocean Road Partners purchased 67 acres of oceanfront property in the town of Narragansett, Rhode Island (the town).[1] Among the 67 acres purchased were 44.6 acres commonly referred to as the "Black Point property." Ocean Road Partners attributed $2 million of the $2.4 million purchase price to the Black Point portion of the purchased land. On July 7, 1989, the State Department of Environmental Management (DEM) filed on behalf of the state a statement of condemnation of the Black Point property.

At the time of condemnation, Black Point consisted of unimproved acreage to which the town had applied more restrictive zoning requirements. The town adopted a change in zoning shortly after the expiration of a special exception that had been granted to Ocean Road Partners under the previous zoning classification, which exception would have allowed the construction of condominia on the Black Point property. This new zoning classification, designated R–80, imposed severe limitations for development on land within or near wetlands, intertidal zones, coastal ponds, rivers, or watersheds and allowed only single-family homes on 80,000–square–foot minimum lots.

The state offered Ocean Road Partners $6,448,000 as compensation for the taking, but this offer was rejected. In accordance with G.L.1956 (1990 Reenactment) §§ 37–6–17 and 37–6–18, Ocean Road Partners, on November 3, 1989, exercised its prerogative to receive from the state the proffered $6,448,000 and then petitioned the Superior Court for an assessment of damages.

After a jury-waived trial, the Superior Court awarded Ocean Road Partners $15.5 million for the condemnation plus interest in the amount of $2,523,265, for a total of $18,-023,265. Subtracted from this amount was payment plus interest totaling $6,486,033, thus yielding a net award of $11,536,232. On the state's appeal, this Court vacated the judgment of the Superior Court and remanded the matter for a new trial. *Ocean Road Partners v. State,* 612 A.2d 1107 (R.I.1992). In that opinion, this Court agreed with the state's argument that R–80 zoning prohibited the eighty-unit condominium development that Ocean Road Partners had planned to build. Therefore, we held that the trial court had erred in arriving at a valuation on the basis of the assumption that approval for such a development on Black Point was possible. *Id.* at 1113.

On remand, a second nonjury trial was held in Superior Court from June 17, 1993, through June 23, 1993. At trial, Ocean Road Partners presented the testimony of Stephen Garofalo (Garofalo), an engineer who had designed a twenty-lot development for the property that would conform to the R–80 zoning (Garofalo plan). Garofalo testified that the plan would also meet Coastal Re-

---

1. A more detailed discussion of the Black Point condemnation and the events leading up to the first appeal heard by this Court is given in *Ocean Road Partners v. State,* 612 A.2d 1107, 1108–10 (R.I.1992).

sources Management Council (CRMC) requirements that prohibit building within 75 feet of a coastal area. He acknowledged, however, that this proposed development would need a special exception from a town prohibition of building within 200 feet of the coast and explained that six of the twenty lots would require such special exceptions.

William Coyle (Coyle), a real estate appraiser, also testified on behalf of Ocean Road Partners. Using comparable sales to estimate the total sales price of the twenty lots in the Garofalo plan, Coyle set their value at $13,575,000. In his analysis, Coyle relied heavily on the sale in December 1989 of one particular property, referred to by the parties as the "Mancini property," approximately five miles from Black Point. The Mancini property consisted of three lots: two one-acre lots, each zoned R–40 that would allow a buyer to build a single-family home on each lot, and a third lot that provided access to the two one-acre lots. Nevertheless, Coyle determined that the lots, which were sold together to one buyer, had merged, and he evaluated the sale as the sale of a single two-acre lot that had sold for $700,000.

After deducting the expenses of development, marketing, taxes, and insurance, Coyle determined that $12,148,250 represented the anticipated income from the development of Black Point. He then deducted 10 percent to account for the entrepreneurial profit that a developer would require to develop the property. Coyle added the 10 percent back into the figure, however, because Ocean Road Partners was itself a developer and would be, in his estimation, entitled to the profit. After adjusting for holding costs, Coyle estimated that the property was worth $10.2 million at the time of the taking.

The state presented an engineer, Steven Clarke (Clarke), who testified that he had developed a plan for a seventeen-lot subdivision at Black Point (state's plan) after considering the regulations of the CRMC and the DEM as well as the town's zoning ordinances. Clarke stated that any plan requiring a special exception from the 200–foot buffer zone imposed by the town would result in unnecessary, self-induced hardship for the developer and that it would be speculative to assume that such an exemption could be obtained. Although Clarke admitted that special exceptions might be needed for certain of the lots in the plan he proposed, he stressed that such relief related to a different ordinance involving high-water tables under which certain design and engineering accommodations would make approval by the town nondiscretionary and therefore nonspeculative.

The state's appraiser, Thomas Andolfo (Andolfo), testified that he believed the best use of the property was the seventeen-lot subdivision plan and that "squeez[ing] in" other lots would lower the net return to the developer. Andolfo took into account the Mancini property, but he construed the sale price as applying to two one-acre lots. After analyzing this and numerous other comparables, Andolfo determined that the total gross proceeds of the development would be $8,410,000. He deducted for expenses and an entrepreneurial profit of 13 percent and figured the present value of the net proceeds, after which calculations he arrived at a fair-market value of $5,064,572 as of the date of condemnation.

The trial justice issued a bench decision on June 23, 1993, in which he concluded that the seventeen-lot subdivision proposal of the state's engineer constituted a "far more palatable" plan for the property. He determined that a prudent buyer, wary of possible controversy with this land, would hesitate to buy Black Point if approval of a special exception were required, and he found that the relief needed under Garofalo's plan would be more difficult to procure. In addition, the trial justice rejected the proposition that the Mancini property was comparable to the proposed parcels at Black Point and determined that both appraisers had incorrectly adjusted the value of their comparable parcels: Andolfo's yielding a value that was too low, and Coyle's producing a value that was too high. The trial justice himself conducted an analysis of the comparable parcels and arrived at a value of the property at the time of the taking of $6.1 million.

Because the trial justice's valuation of the condemned property was less than the sum

already paid to Ocean Road Partners by the state, the state, on July 1, 1993, filed a motion for entry of judgment in its favor for the amount of the difference between the $6,448,000 already paid to the partnership and the $6.1 million awarded by the trial justice. On July 16, 1993, the trial justice denied the state's motion, stating that although he agreed that the state is entitled to the difference between fair-market value and the amount already paid, no specific provision of Rhode Island law "contemplates that the State of Rhode Island would be held to a sum less than the amount of the last offer." He concluded therefore that the state would have to file a separate action against Ocean Road Partners to recover the overpayment.

On July 27, 1993, Ocean Road Partners appealed the trial justice's finding in regard to Black Point's fair-market value, alleging that the trial justice erred, first, in determining that the highest and best use of Black Point was as a seventeen-lot subdivision rather than as a twenty-lot subdivision; second, in rejecting the sale of the Mancini property as a comparable property; and third, in deducting entrepreneurial profit from the just compensation he awarded Ocean Road Partners. The state filed a cross-appeal on August 13, 1993, challenging the Superior Court's determination that the state must file a separate action in order to recover the amount it paid Ocean Road Partners above fair-market value.[2] We address the four issues presented on appeal *seriatim.*

### Highest and Best Use of the Property

On appeal, Ocean Road Partners claimed that the trial justice had erred in accepting a valuation on the basis of the state's plan for a subdivision rather than on the subdivision proposed by Garofalo. The partnership argued that, like its own plan, the state's plan also would require special approval by the town in order to build on certain lots. The state, in response, maintained that the relief needed for the Garofalo plan would have been much more difficult to secure than the relief required by the state's plan and that

even if built, the Garofalo plan would not generate more revenue because of increased holding costs, the smaller size of some lots, and their proximity to the street and a nearby right-of-way.

This Court's precedents in land-condemnation cases are well settled: "In reviewing a judgment rendered by a trial justice sitting without a jury in a land-condemnation proceeding, we accord the justice's findings of fact and conclusions of law great weight," and consequently this Court will not disturb such a judgment unless the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *Capital Properties, Inc. v. State,* 636 A.2d 319, 323 (R.I. 1994) (citing *Gorham v. Public Building Authority,* 612 A.2d 708, 712 (R.I.1992); *Fuller v. Rahill,* 120 R.I. 832, 838–39, 391 A.2d 103, 106 (1978)).

In the previous litigation on the valuation of Black Point, we reaffirmed the principle that condemned land must be assessed according to its fair-market value in light of existing zoning restrictions and not on the basis of an unlawful use. *Ocean Road Partners,* 612 A.2d at 1110. This is not an inflexible rule, however, and if a claimant presents sufficient evidence to establish a reasonable probability that a proscribed use will be made allowable in the near future, the trial justice may consider that use in determining fair-market value. *Palazzi v. State,* 113 R.I. 218, 222–23, 319 A.2d 658, 661–62 (1974). In the instant matter, we are of the opinion that Ocean Road Partners did not meet its burden of establishing such a probability, and therefore the trial justice acted appropriately in refusing to accept the Garofalo plan. 4 Nichols' *The Law of Eminent Domain* § 12C.03[2] at 83 (3d rev. ed. Sackman 1995).

The trial justice determined that the Garofalo plan "would be met * * * with resistance" in the community because of the general anti-development sentiments in the town and the "history of controversy" over the Black Point property. The trial justice

---

**2.** The state in fact has filed suit in the Superior Court to recover the excess payment to Ocean Road Partners. Providence Superior Court C.A. 93–4329. On October 13, 1993, a motion for summary judgment filed by the state and a motion to dismiss filed by Ocean Road Partners were denied without prejudice pending the instant appeals to this Court.

took note of the fact that the town had adopted a comprehensive building moratorium and that Black Point was rezoned more restrictively as part of a comprehensive zoning ordinance adopted on November 16, 1987. After considering these events, the trial justice concluded that "by the time the comprehensive enactment of November, 1987 was enacted, * * * the probability of a rezoning to permit greater density at Black Point was little or nil."

■ Ocean Road Partners' appraiser, Coyle, opined that approval of a special exception to the 200–foot buffer-zone requirement was likely at the time of condemnation. Coyle formed this opinion because Ocean Road Partners obtained in 1986 a special exception for its original plan to develop condominia. This Court concurs with the trial justice's assessment that the 1986 rezoning of the property and the granting of a special exception in the same year have little, if any, bearing on what action the Town's zoning board would have taken at the time of condemnation in 1989, particularly in light of the trend toward more restrictive land use regulation, not more permissive. The trial justice was under an obligation to valuate Black Point in light of then-existing zoning restrictions, and he acted properly in dismissing the Coyle plan that proposed a then-unlawful use of the property. *Ocean Road Partners,* 612 A.2d at 1110.

Moreover, we reject Ocean Road Partners' argument that the state's plan would be as problematic as the Garofalo plan. Although the state's plan would require special approval for four lots within high-water-table zones, one of which was located entirely within a special flood hazard zone, Clarke stated that such nondiscretionary approval could be obtained by meeting objective engineering and design standards in constructing houses on these lots. The trial justice found that a potential buyer of the site who was seeking to avoid controversy would opt for the state's plan in developing the property and that the state's plan would allow development in the shortest time and with the least contact with zoning authorities. Ocean Road Partners failed to present reliable evidence that relief from the 200–foot coastal-buffer-zone re-

quirement was probable, and therefore, the trial justice did not err in rejecting the Garofalo plan.

## Mancini Property

■ Next, Ocean Road Partners challenged the trial court's rejection of the Mancini property as a comparable property for purposes of determining Black Point's fair-market value. Ocean Road Partners pointed out that although the Mancini property was zoned differently from the Black Point property, the two properties were located in close proximity to each other and the Mancini property was negotiated for sale at the approximate time of Black Point's condemnation. Ocean Road Partners therefore argued that the two-acre Mancini property should be considered as having comparable value to the two-acre lots in Black Point. The trial justice dismissed this argument in his bench opinion when he stated that "two R–40s do not make an R–80." He remarked further that the sale took place subsequently to the condemnation of Black Point and that Coyle had failed to consider the right of a purchaser to build two single-family dwellings on the R–40 lots.

Having carefully reviewed the evidence and the decision of the trial court, this Court concludes that the trial justice did not overlook or misconceive material evidence and was not clearly wrong in dismissing the Mancini property as a comparable one. *Harbor Marine Corp. v. Briehler,* 459 A.2d 489, 492 (R.I.1983). It is "well established that the value of property increases if the property is densely zoned." *Ocean Road Partners,* 612 A.2d at 1110. The record clearly shows that the Mancini property was zoned more densely and less restrictively than was Black Point. Therefore, the trial justice's finding that the sale of the Mancini property was not an adequate comparable sale was a factual determination well within his discretion to make, which determination was not clearly wrong.

## Entrepreneurial Profit

Ocean Road Partners claimed on appeal that the partnership was denied just compensation by virtue of the trial justice's deduc-

**252**

tion of the entrepreneurial profit from his valuation of the Black Point property. The partnership argued that because Ocean Road Partners itself was intending to develop the property, just compensation must include an anticipated profit. Ocean Road Partners further argued that "the Constitutional mandate is not fair market value and when a calculation of fair market value under a particular factual situation fails to compensate the owner for the value of its property rights and interests, it does not satisfy the Constitutional mandate of just compensation."

Notwithstanding Ocean Road Partners' assertion to the contrary, it is well settled law in Rhode Island that the measure of compensation due to a landowner whose property has been taken by eminent domain is the fair-market value of the property. *J.W.A. Realty, Inc. v. City of Cranston*, 121 R.I. 374, 380, 399 A.2d 479, 482 (1979). In support of its argument that it is entitled to the entrepreneurial profit, Ocean Road Partners cites a Louisiana case, *State Through Department of Highways v. Terrace Land Co.*, 298 So.2d 859 (La.1974). In that case the Louisiana Supreme Court held that an owner-developer whose land had been taken by the state was entitled to recover the retail value of each lot, reduced by development costs but not reduced by the entrepreneurial profit. *Terrace Land* is distinguishable from the instant matter, however, because the owner-developer in that case had recorded the subdivision of the property, developed lots and streets, and installed drainage, water, gas, and sewer lines. Moreover, at the time of the taking, approximately seventy lots had been sold and homes had been constructed thereon. Therefore, the *Terrace Land Co.* court held that

"where an owner-developer owns land forming part of a subdivision *actually developed and in the process of being sold as individual lots,* and where a portion of the tract destined for that use but not actually yet developed is taken, the owner-developer is entitled to receive just and adequate compensation for the tract taken on the basis of the retail value of the lots to

individual purchasers * * * rather than artificially limited to a value based upon a hypothetical sale as a single-tract unit to another developer." (Emphasis added.) 298 So.2d at 863.

*See City & County of Honolulu v. Bonded Investment Co., Ltd.,* 54 Haw. 385, 507 P.2d 1084 (1973) (where two parcels were condemned and the development of one parcel had begun, financing had been secured, plans for construction had been drawn, and all units were under contract for sale—but where the second parcel was undeveloped and no units had been sold—court held that it would be mere speculation to allow damages for lost profits for the second parcel).

The facts of the instant matter do not require us either to adopt or to reject the holding of the Louisiana court in *Terrace Land* because Ocean Road Partners had made no improvements to the Black Point property by the time the state took the property by eminent domain. In fact, the subdivision from which Ocean Road Partners expected to derive profits was created in anticipation of trial and not in anticipation of actual development of the property. Therefore, even under the holding in *Terrace Land,* Ocean Road Partners would not be entitled to be compensated for the anticipated entrepreneurial profit. Hence, the trial justice did not err in deducting said profit from the award of just compensation.

### Overpayment to Ocean Road Partners

Last, we address the state's cross-appeal seeking reimbursement for the overpayment to Ocean Road Partners. The state has requested that this Court reverse the trial justice on this issue and enter judgment for the state in the amount of $348,000, the difference between the prelitigation payment of $6,448,000 and the fair-market value of $6.1 million. Ocean Road Partners argued that the statute does not authorize the entry of judgment in favor of the state in condemnation proceedings and that the state is required to pursue a separate action to collect the funds in question.[3] The question before

---

3. Ocean Road Partners apparently did not dispute the state's entitlement to these funds in the event the valuation of the Superior Court was

us is one of statutory construction, and this Court as the final arbiter of such questions will construe the condemnation statute. *Matter of Falstaff Brewing Corp.,* 637 A.2d 1047, 1049 (R.I.1994); *Krikorian v. Rhode Island Department of Human Services,* 606 A.2d 671, 675 (R.I.1992). In interpreting a statutory provision, we shall adopt the interpretation "most consistent with the statute's policies or obvious purposes." *Bailey v. American Stores, Inc./Star Market,* 610 A.2d 117, 119 (R.I.1992).

■ The statute governing the state's exercise of its power of eminent domain, G.L. 1956 (1990 Reenactment) chapter 6 of title 37 (the statute), does not provide expressly for entry of judgment for the state in an assessment proceeding in which the state has paid a condemnee more than the assessed fair-market value of the subject property. Although § 37–6–23 requires the state to satisfy judgments in condemnation proceedings, there is no analogous provision requiring a landowner who has been overpaid to return the excess payment. We note, however, that § 37–6–25, entitled "Liberal construction—Technicalities—Severability," states:

> "The provisions of this chapter * * * shall be construed liberally in order to accomplish the purposes hereof, and where any specific power is given to the state properties committee or the acquiring authority by the provisions thereof, the statement thereof shall not be held to exclude or impair any implied and incidental powers and such additional powers, not inconsistent with any express provisions of this chapter * * * which may constitutionally be conferred upon it, as may be proper and reasonably necessary to effectuate the purposes of this chapter * * *."

Further, the statute requires that the state pay a condemnee 100 percent of the acquiring authority's initial offer, pending final disposition of a court proceeding. Section 37–6–17. Consequently, we are of the opinion that the statutory-condemnation procedure was designed to award fair compensation for land taken for public use but was not intended to provide unjust enrichment to a condemnee at the expense of the state. Our holding on this

issue is in accord with the holdings of other jurisdictions. In *State Department of Transportation v. Montgomery Ward Development Corp.,* 79 Or.App. 457, 719 P.2d 507 (1986), for example, the Oregon Court of Appeals held that a property owner whose land had been condemned by the state was not entitled to a windfall simply because the state deposited excess funds prior to trial. The court concluded that "[b]ecause the state is required to pay amounts by which the verdict exceeds the deposit * * * common sense indicates that it should likewise be entitled to recover the amount by which its deposit exceeds the verdict." *Id.* at 462, 719 P.2d at 511; *see, e.g., United States v. 40.75 Acres of Land,* 76 F.Supp. 239, 246 (N.D.Ill.1948) (in dicta, court indicated that, in case of overpayment, "Government will then be entitled to a judgment of restitution for the excess"); *State ex rel. Missouri Highway and Transportation Commission v. Wilson,* 864 S.W.2d 341, 343–44 (Mo.Ct.App.1993) (citing *State ex rel. State Highway Commission v. Morganstein,* 588 S.W.2d 472, 477 (Mo. banc 1979), for proposition that taking agency "has the right to obtain restitution for any excess amount finally awarded over the * * * award and this right is rooted in principles of equity and fairness").

■ As further justification for entry of judgment in its favor, the state has argued that by requiring the state to initiate a separate lawsuit in order to recover overpayments, state officials face a disincentive to make fair offers for condemned land. Such a concern was evidenced in the United States Supreme Court's holding in *United States v. Miller,* 317 U.S. 369, 381, 63 S.Ct. 276, 284, 87 L.Ed. 336, 347, *reh. denied,* 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1943), in which the Court warned that:

> "to encourage federal officials to underestimate the value of the property [would cause] the Government [to] be saddled with interest on a larger sum from date of taking to final award, and would * * * deny the owner the immediate use of cash approximating the value of his land."

affirmed but argued that the state was required

to file a separate action to obtain judgment.

We are of the opinion that were we to require the filing of a separate lawsuit, state officials would be encouraged to underestimate the value of condemned property and consequently to promote unnecessary litigation. Such a result would contradict the clear legislative intent behind the statute, particularly § 37–6–17, which encourages the resolution of takings claims without litigation. Finally, our holding reinforces the state's position that a separate action would be a costly and an unnecessary formality in which no issues remain to litigate, inasmuch as the fair-market value of the land would have been previously established. It is clear that the state is entitled to the return of the overpayment and that the most expeditious procedure for remedying the overpayment is the entry of judgment in favor of the state at the conclusion of the trial that assessed the fair-market value of the condemned property.

In conclusion, therefore, the appeal of Ocean Road Partners is denied and dismissed. The cross-appeal of the state is sustained. We modify the judgment of the Superior Court by directing entry of judgment in favor of the state in the amount of $348,000. The papers may be returned to the Superior Court with direction to enter judgment for the state in accordance with this opinion.