**The TRAVELERS INSURANCE CO. as subrogee of Carol Pearl, Inc., Plaintiff,**

v.

**PRIORITY BUSINESS FORMS, INC., Defendant.**

**No. CIV. A. 96-558L.**

United States District Court, D. Rhode Island.

July 15, 1998.

Douglas B. Lang, Mark E. Opalisky, Cozen & O'Connor, Philadelphia, PA, Anthony F. Cottone, Providence, RI, for Plaintiff.

Richard L. Patz, Hines and Patz, Inc., Providence, RI, for Defendant.

*OPINION AND ORDER*

LAGUEUX, Chief Judge.

This matter is before the Court on the motion of defendant Priority Business Forms, Inc. ("Priority") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The case arises out of a burglary and arson committed at property owned by Carol Pearl, Inc. ("Carol Pearl"), insured by plaintiff The Travelers Insurance Co. ("Travelers"), and leased to Priority. Travelers, as subrogee of Carol Pearl, blames Priority for the damage to the property, and seeks to recover from Priority the amounts paid to Carol Pearl under the applicable insurance policy.

For the reasons that follow, this Court concludes that Travelers' claims against Priority are without merit. As a result, Priority's motion for summary judgment is granted.

I. Background

Unless otherwise noted, the following facts are undisputed. Priority is in the printing business. In 1982, Priority began leasing a building (the "Premises") located at Four Industrial Lane, in Johnston, Rhode Island, in which to operate its business. At that time, the Premises were owned by Eugene Pannullo ("Pannullo"). In or around 1983, Carol Pearl purchased the Premises from Pannullo, and assumed the existing lease with Priority. Subsequently, Priority and Carol Pearl negotiated additional leases, which did not differ materially from the original lease assumed by Carol Pearl when it purchased the Premises from Pannullo. Priority was the sole tenant of the Premises at all material times.

The lease in effect when the present dispute arose (the "Lease") contained the following relevant provisions:

> *Seventh:* ... c) Tenant shall, on or before the last day of the term hereby granted or of any extended term, or upon the sooner termination of this lease, peaceably and quietly leave, surrender, and yield up unto the Landlord the leased premises ... broom clean and in good order and condi-

tion except for reasonable wear and tear thereof, damage by the elements, fire, acts of God, insurrection, riot, invasion, commotion or acts of military power.

. . . . .

*Eighth:* The Tenant shall keep the interior of the leased premises ... in good order and repair, ordinary wear and use and damage by fire or other unavoidable casualty excepted.

. . . . .

*Fourteenth:* ... b) This lease contains all of the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner than by an agreement in writing, signed by all the parties hereto or their respective successors in interest.

When Priority first began leasing the Premises from Pannullo in 1982, a burglar alarm system (the "Alarm") was already in place. The Alarm had been installed by Sonitrol, Inc., a central station alarm and monitoring company. Shortly after Carol Pearl purchased the Premises from Pannullo, the latter informed Ronald Spagnole, a principal of Carol Pearl, that the alarm system was in place and operational. On January 21, 1991, Priority discontinued the alarm system due to recurring false alarms and budgetary constraints. Priority did not inform Carol Pearl of this action.

On October 2, 1995, an unknown person or persons gained access to, and set fire to, the Premises. The Premises were severely damaged by the blaze, and the arsonists were never apprehended. Carol Pearl was insured by Travelers at all relevant times; Travelers thus paid Carol Pearl $569,000 for the damage and destruction to the Premises.

On October 6, 1996, Travelers filed a complaint (the "Complaint") in this Court. Travelers alleges that it was subrogated, to the extent of its payment to Carol Pearl, to Carol Pearl's right of recovery against Priority. Count I of the Complaint alleges negligence; Count II alleges breach of lease; and Count III alleges detrimental reliance.[1] While the precise nature of each claim is set forth *supra*, the jugular vein of Travelers' gripe with Priority is that Priority discontinued the Alarm, and failed to notify Carol Pearl of that fact. Travelers complains that this allowed the arsonists to act undetected, giving them time to do their dirty work unbothered by public authorities, which would have swiftly reported to the scene had the Alarm been operational. Travelers also argues that Priority's improper storage of certain chemicals on the Premises allowed the arsonists to literally add fuel to the fire, and created a dangerous condition of which Priority was obligated to warn Carol Pearl.

On July 23, 1997, Priority filed a Motion for Summary Judgment, with an attendant Statement of Undisputed Facts as required by Local Rule 12.1. Travelers responded on August 25, 1997, and Priority then filed a "Response to Plaintiff's Objection to Summary Judgment Motion" on September 4, 1997.

On September 15, 1997, this Court held a hearing on Priority's motion for summary judgment. Following oral arguments, the Court took the matter under advisement. The Court has considered all the materials submitted and the arguments of the parties, and the matter is now in order for decision.

## II. Standard for Decision

Fed.R.Civ.P. 56(c) sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the

1. Travelers invoked this Court's diversity jurisdiction under 28 U.S.C. § 1332. It is undisputed that Travelers is a New Jersey corporation with its principal place of business in Connecticut, while Priority is a Rhode Island corporation with its principal place of business in Rhode Island. It is further undisputed that the amount in controversy far exceeds the jurisdictional amount, formerly $50,000.00, now $75,000.00.

outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991).

III. Applicable Law

It is undisputed that, as a federal court exercising diversity jurisdiction over state-law claims, this Court, sitting in Rhode Island, is to apply Rhode Island law. *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 464–65, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Moores v. Greenberg,* 834 F.2d 1105, 1107 (1st Cir.1987). In so doing, the Court must attempt to determine how the Rhode Island Supreme Court would resolve this case. To that end, the Court "seek[s] guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1151 (1st Cir.1996).

IV. Count I: Negligence

As noted, the core of Travelers' negligence claim is that Priority improperly discontinued the existing burglar alarm, and failed to notify Carol Pearl of that fact. Travelers contends that the lack of a functioning burglar alarm allowed the arsonists to enter the Premises undetected, and allowed them to act unmolested by public authorities, which would have rapidly responded had the Alarm been functional. In addition, Travelers asserts that Priority improperly failed to secure "highly flammable" chemicals on the Premises, thus allowing the arsonists access to such materials for use in their illegal endeavor. Finally, Travelers contends that the presence alone of such chemicals on the Premises, together with the bulk storage of paper, created a hazardous condition of which Priority was at least obligated to warn Carol Pearl.

■ In order to prevail on a claim of negligence in Rhode Island, a plaintiff must prove that: (1) the defendant owed the plaintiff a legal duty to refrain from negligent activities; (2) the defendant breached that duty; (3) the breach proximately caused harm to the plaintiff; and (4) there was actual loss or damage resulting. *Splendorio v. Bilray Demolition Co., Inc.,* 682 A.2d 461, 466 (R.I.1996).

■ Clearly, Priority owed no duty to Carol Pearl to maintain either the existing Sonitrol burglar alarm or any other such system. No such duty can be found in the Lease, and none exists at common law.

Undoubtedly realizing this, Travelers instead suggests that the aforementioned specific acts and omissions by Priority were simply the *breaches* of a broader duty: the "obligation to act reasonably to protect the Premises". Travelers submits three bases for this duty: (1) the relationship between Priority and Carol Pearl and the terms of the Lease; (2) "the fact that Priority was in exclusive possession of certain knowledge which should have prompted it to maintain central station monitoring of the alarm and store the flammable materials within the Premises in a secured area"; and (3) Priority's creation of a "dangerous condition" within the Premises, and its concomitant failure to warn Carol Pearl thereof.

In Rhode Island, "whether ... a duty exists in a particular factual situation is a question of law for the court's determination." *Mallette v. Children's Friend and Service,* 661 A.2d 67, 70 (R.I.1995). The Rhode Island Supreme Court has lamented "the difficulty of crafting a workable test to determine whether a duty exists in a particular case." *Ferreira v. Strack,* 636 A.2d 682, 685 (R.I. 1994). The Court counsels consideration of " 'all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations and notions of fairness.' " *Mallette,* 661 A.2d at 70 (quoting *Kenney Mfg. Co. v. Starkweather & Shepley, Inc.,* 643 A.2d 203, 206 (R.I.1994)). While the foreseeability of harm to the plaintiff resulting from the defendant's conduct is the "linchpin" in the duty inquiry, *Splendorio,* 682 A.2d at 466, "foreseeability of injury does not, in and of itself, give rise to a duty." *Ferreira,* 636 A.2d at 688 n. 4. In addition, a contractual relationship may form the basis of a duty cognizable in negligence. *Buszta v. Souther,* 102 R.I. 609, 232 A.2d 396, 399 (1967).

In the present circumstances, the Lease is the natural starting point for the inquiry into the issue of duty. The express terms of the Lease clearly do not impose the duty which Travelers suggests. While Paragraph Seventh(c) of the Lease requires Priority to yield up the Premises in "good order and condition" at the end of the lease term, that provision goes on to relieve Priority from the obligation to protect against damage by fire. Similarly, Paragraph Eighth requires Priority to maintain the Premises in "good order and repair, ordinary wear and use and *damage by fire* or other unavoidable casualty *excepted.*" (emphasis added). Thus, the Lease clearly does not expressly obligate Priority to protect the Premises against fire.[2] In light of the Lease's exclusivity clause, Paragraph Fourteenth(b), this would seem to be the end of the inquiry; the Lease spells out the respective duties of the landlord and tenant, and its express terms clearly do not impose upon Priority the duty to protect the Premises against fire. Thus the Lease does not make Priority an insurer of the Premises.

However, some courts have held that lease provisions, generally exempting the tenant from responsibility for damage to the leased property resulting from fire, will not excuse the tenant from liability if the fire was caused by the tenant's own negligence. *See, e.g., Dilks v. Flohr Chevrolet, Inc.,* 411 Pa. 425, 192 A.2d 682 (1963); *Sears, Roebuck and Co. v. Poling,* 248 Iowa 582, 81 N.W.2d 462 (1957); *Winkler v. Appalachian Amusement Co.,* 238 N.C. 589, 79 S.E.2d 185 (1953). These courts have required that a provision purporting to excuse the tenant from his own negligence be clearly and unambiguously worded. *Id.*

In addition, some courts have looked beyond the lease itself and found that, as a matter of common law, a tenant owes the landlord the duty to act reasonably to protect the leased premises against fire. *See Orfanos v. Athenian, Inc.,* 66 Md.App. 507, 505 A.2d 131, 135 (1986) (tenant owed landlord duty to prevent property from becoming fire hazard); *New Hampshire Ins. Co. v. Hewins,* 6 Kan.App.2d 259, 627 P.2d 1159, 1160 (1981) (implied obligation to return premises to landlord at end of lease, "unimpaired by the negligence of the tenant", included duty not to negligently cause fire).

At least one court has found that the duty to exercise ordinary care to keep leased property in good order, and to return it at the end of the lease term in the same condition barring ordinary wear and tear, includes the duty to exercise ordinary care to protect the property against acts of vandalism by third parties. *Granger Univ. Ave. Corp. v. First State Ins. Co.,* 99 A.D.2d 1022, 473 N.Y.S.2d 813, 815 (N.Y.App.Div.1984).

■ Travelers cites no case in which the Rhode Island Supreme Court has either imposed such a duty upon tenants, or rendered inoperable lease provisions such as those exempting Priority from responsibility for damage to the Premises "by fire". However, such a rule of law is manifestly reasonable;

2. The Court shall elaborate on this point in the discussion of Count II, Travelers' claim for breach of lease.

this Court sees no reason to automatically relieve a tenant from responsibility for its own negligent conduct simply because the lease failed to specifically impose such responsibility. Thus, this Court concludes that the Rhode Island Supreme Court would impose upon Priority the duty to act reasonably to protect the Premises against fire, and would not construe the Lease to relieve Priority from the duty to refrain from negligent conduct.

Whether Priority breached this duty is a close question; Priority certainly appears to have acted reasonably in the conduct of its business operations, both in discontinuing the Alarm and in storing various materials on the Premises. However, the determination as to whether a defendant has breached a duty, *i.e.*, whether its conduct was reasonable or unreasonable under all the circumstances, is one of fact, and, therefore, generally cannot be resolved by summary judgment. *See Denisewich v. Pappas,* 97 R.I. 432, 198 A.2d 144, 147 (R.I.1964); *Saritelli v. Industrial Trust Co.,* 84 R.I. 42, 121 A.2d 329, 332 (1956). As a result, the Court declines to declare as a matter of law that Priority acted with due and reasonable care to protect the Premises against fire in this particular situation.

Where there is smoke, however, there is not always fire; even assuming *arguendo* that Priority breached its duty to Carol Pearl, Travelers' negligence claim is fatally drenched by the fact that Priority's actions were not the proximate cause of the destruction to the Premises.

In Rhode Island,

> "a defendant's original act of negligence will be considered as a remote and not a proximate cause of a plaintiff's injury when there is an intervening act on the part of a responsible third person unless it be made to appear that the defendant reasonably should have anticipated that such an intervening act would be a natural and probable consequence of his own act."

*Nolan v. Bacon,* 100 R.I. 360, 216 A.2d 126, 129 (1966) (quoting *Clements v. Tashjoin,* 92 R.I. 308, 168 A.2d 472, 475 (1961) (Roberts, J., concurring)).

Determinations of foreseeability, and specifically of whether a plaintiff's injury was proximately caused by a defendant's negligent acts, or instead by the unforeseeable, intervening act of a responsible third person, are ordinarily issues of fact, and are therefore usually not determined by summary judgment. *Pantalone v. Advanced Energy Delivery Systems, Inc.,* 694 A.2d 1213, 1216 (R.I.1997); *Splendorio,* 682 A.2d at 467.

However, the Rhode Island Supreme Court has not hesitated, in certain circumstances, to declare the absence of proximate cause as a matter of law. *See Splendorio,* 682 A.2d at 467; *Walsh v. Israel Couture Post, No. 2274 V.F.W. of the United States,* 542 A.2d 1094, 1097 (R.I.1988); *Clements,* 168 A.2d at 474; *Kemplin v. H.W. Golden & Son, Inc.,* 52 R.I. 89, 157 A. 872, 873 (1931).

In *Clements,* the defendant allegedly left the key in the ignition of his automobile, unattended on the grounds of a mental institution. 168 A.2d at 472. A patient at the institution subsequently entered and operated the auto, and negligently collided with the plaintiff's auto, injuring the plaintiff. *Id.* at 472–73. The Rhode Island Supreme Court held that the defendant was not bound to anticipate that his neglect in leaving the key in the ignition would "naturally and probably" result in a patient stealing the vehicle, operating it negligently, and injuring the plaintiff. *Id.* at 474.

Similarly, the intervening illegal act of a third person was sufficient to relieve the defendant from liability for his original negligent act in *Splendorio,* 682 A.2d at 467. In that case, an asbestos inspector was hired prior to the demolition of a building to determine whether the building contained any asbestos. *Id.* at 463. The inspector certified that the building did not. *Id.* The building was demolished, and subsequently the demolition company, in violation of the law, removed the debris to its own wrecking yard rather than to a licensed solid waste facility. *Id.* It was then discovered that the building had in fact still contained asbestos when demolished. *Id.* The wrecking yard's neighbors, upon learning of the contaminated debris in their midst, sued various parties including the inspector. *Id* at 464. The Rhode

Island Supreme Court held that the inspector was not bound to anticipate the demolition company's "unforeseeable and illegal superseding act." *Id.* at 467.

Even beyond intervening *illegal* acts of third persons, the Rhode Island Supreme Court has on several occasions found that certain intervening *negligent* acts of third persons are unforeseeable as a matter of law, and therefore, break the chain of proximate causation flowing from a defendant's original negligent acts. *See Walsh,* 542 A.2d at 1097 (where defendant negligently damaged railing on property of another, defendant was not bound to anticipate that property owner would allow nine days to pass without repairing railing, resulting in injury to plaintiff); *Kemplin,* 157 A. at 872–73 (where defendant employer ordered plaintiff employee to cross a street, defendant was not bound to anticipate that plaintiff would be struck by an automobile "being driven at an unsafe and unreasonable rate of speed.").

■ This Court concludes that, given this body of precedent, the Rhode Island Supreme Court would conclude that the destruction to the Premises in this case was proximately caused by an illegal and unforeseeable act of a responsible third person, and not caused by any negligence on the part of Priority. *See Splendorio,* 682 A.2d at 467; *Walsh,* 542 A.2d at 1097; *Clements,* 168 A.2d at 474; *Kemplin,* 157 A. at 873. The act of arson which resulted in the damage to the Premises was not only an illegal act which Priority was not bound to anticipate; it was also quite simply not the natural and probable consequence of Priority's allegedly negligent behavior. The commission of arson by a third party is not the natural and probable result of discontinuing a *burglar* alarm system and failing to notify the landlord thereof.

In an attempt to take this case outside the ordinary zone of foreseeability, Travelers alleges that Priority "was in exclusive possession of certain knowledge which should have prompted it to maintain central station monitoring of the alarm and store the flammable materials within the Premises in a secured area." Travelers points to Priority's knowledge that large amounts of paper, as well as flammable chemicals, on the Premises, would be highly combustible in the event of an arson. These are hardly earth-shattering revelations. Priority was in the printing business, as Carol Pearl well knew; hence the paper and chemicals at the Premises. Its possession of these materials on the Premises does not in any way enhance the foreseeability of an act of arson by a third party.

Travelers also points to Priority's identification to Travelers' investigators, after the arson, of three "disgruntled" Priority employees who may have been responsible for the destruction. To Travelers, this is evidence that Priority knew or should have known, before the arson, that such an act loomed on the horizon. This argument cannot be taken seriously; the post-arson identification of unhappy employees, without more specific evidence that their intention to destroy the property was or should have been known by Priority *prior* to the arson, will not suffice to make the intervening arson the "natural and probable consequence" of Priority's allegedly negligent conduct. Many employees are unhappy. Few torch their employers' property.

■ Finally, the presence of flammable chemicals on the Premises was a *condition,* rather than a proximate *cause,* of the destruction. *See Clements,* 168 A.2d at 475. No danger existed in the unsecured storage of these materials alone; absent the illegal intervening act of arson, the Premises would not have been destroyed. *Id.*

Travelers nevertheless cites cases holding that a tenant who has allowed the leased property to become a "fire trap" may be liable for damage resulting from an eventual fire, regardless of the cause. *See Chicago, Milwaukee St. Paul & Pacific R.R. Co. v. Poarch,* 292 F.2d 449 (9th Cir.1961); *Orfanos,* 66 Md.App. 507, 505 A.2d 131. Travelers cites no Rhode Island case adopting this relaxed approach to proximate cause, but does cite *Hennessey v. Suhl,* 114 R.I. 311, 333 A.2d 151, 152 (1975) for the proposition that "an individual has a duty to warn another of a dangerous condition only if that individual should have reasonably foreseen that he created a dangerous situation." In any

event, the only facts alleged which, taken in the light most favorable to Travelers, could be read to indicate that Priority should have reasonably foreseen that the Premises had become a "fire trap" are that Priority kept large amounts of paper and unsecured flammable chemicals on the Premises, and that Priority's insurance carrier expressed concerns about these practices. These allegations are insufficient as a matter of law to bring this case within the "fire trap" cases or the *Hennessey* rule. Travelers' continuous characterization of the subject chemicals as "highly flammable" amounts to overheated rhetoric, unsupported by the record. More fundamentally, the "fire trap" cases and the *Hennessey* rule deal with settings in which the risk of danger is extraordinarily high, *e.g.*, a grease-covered restaurant kitchen. *See Orfanos*, 66 Md.App. 507, 505 A.2d 131. Travelers' allegations do not amount to a colorable claim that Priority, in storing flammable chemicals and paper for use in its indisputably legitimate business activities, kept the Premises in such a state of impending calamity.

Thus, under Rhode Island law, Travelers' negligence claim fails on the crucial element of proximate cause. *See Splendorio*, 682 A.2d at 467; *Walsh*, 542 A.2d at 1097; *Clements*, 168 A.2d at 474; *Kemplin*, 157 A. at 873. There are no facts in dispute which would change this outcome. As a result, the Court concludes that, pursuant to Fed. R.Civ.P. 56, summary judgment is appropriate on Count I of the Complaint.

V. Count II: Breach of Lease

Count II of the Complaint alleges that Priority breached the Lease. However, the Lease does not expressly require Priority to use or maintain a burglar alarm, or to store its materials in any particular way. In addition, Paragraph Fourteenth(b) of the Lease states: "[t]his lease contains all of the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner than by an agreement in writing, signed by all the parties hereto or their respective successors in interest."

Travelers, thus, grounds its claim for breach of lease in the following provisions:

> *Seventh:* ... c) Tenant shall, on or before the last day of the term hereby granted or of any extended term, or upon the sooner termination of this lease, peaceably and quietly leave, surrender, and yield up unto the Landlord the leased premises ... broom clean and in good order and condition *except for* reasonable wear and tear thereof, *damage by* the elements, *fire,* acts of God, insurrection, riot, invasion, commotion or acts of military power.
>
> . . . . .
>
> *Eighth:* The Tenant shall keep the interior of the leased premises ... in good order and repair, ordinary wear and use and *damage by fire* or other unavoidable casualty *excepted.*
>
> . . . . .

(emphasis added).

Travelers points out that, as a result of the arson, the Premises were no longer "in good order, condition and repair", and bases its claim for breach of lease accordingly.

If a lease provision is unambiguous, "there is generally no room for interpretation or judicial construction." *Harbor Marine Corp. v. Briehler*, 459 A.2d 489, 491 (R.I. 1983). The exclusion clauses of Paragraphs Seventh and Eighth of the Lease clearly except damage by fire from Priority's obligation to maintain the Premises in "good order, condition, and repair". Travelers nevertheless argues that the placement of the word "other" in the exclusion clause of Paragraph Eighth extends the word "unavoidable" to the word "fire" in addition to the word "casualty", so that fire is only excepted if it is unavoidable.

The Court quite simply rejects this effort to inject ambiguity into Paragraph Eighth; the word "fire" clearly and unambiguously stands alone, unmodified by the word "unavoidable". As a result, damage to the Premises by fire is excepted from Priority's obligations to maintain the Premises in "good order, condition, and repair." [3]

3. Priority further cites the rule that while the construction of ambiguous contract provisions is

Travelers gamely forges ahead, however, insisting that the Lease's exclusion clauses are invalid. Travelers cites the general rule that "[a] contract will not be construed to indemnify the indemnitee against losses resulting from his or her own negligent acts unless the parties' intention to hold harmless is clearly and unequivocally expressed in the contract." *Rhode Island Hospital Trust Nat'l Bank v. Dudley Service Corp.*, 605 A.2d 1325, 1327 (R.I.1992). This is no doubt true. However, this Court has concluded that the losses in this case did not result from any negligent acts by Priority, even assuming the existence of a legal duty and a breach thereof. As a result, a rule of law governing a defendant's ability to contract for relief from his own negligence is inapposite in this case, and has no bearing on the validity of the exclusion clauses.

Travelers suggests no further reason why the exclusion clauses in the Lease should not govern here; indeed, there is none. As a result, it requires no profound reasoning to conclude that Travelers' claim for breach of lease is meritless, and that summary judgment is appropriate on Count II of the Complaint.

VI. Count III: Detrimental Reliance

The last flickering flame of the Complaint is Travelers' "detrimental reliance" claim. This claim is premised on *Restatement (Second) of Torts* § 323 (1965), which is entitled "Negligent Performance of Undertaking to Render Services", and reads:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Travelers contends that Priority, in maintaining the Alarm in operational status prior to January 21, 1991, "undertook to provide a service which inured to the benefit of Carol Pearl", *i.e.*, by protecting Carol Pearl's property. Travelers maintains that Carol Pearl relied on Priority's "undertaking", *i.e.*, by not taking its own additional measures to protect the Premises. This reliance, Travelers continues, worked to Carol Pearl's detriment when Priority failed to use due care by covertly discontinuing the Alarm, leaving the Premises vulnerable. Finally, Travelers argues that Priority's negligent "undertaking" to provide this "service" to Carol Pearl actually increased the risk of harm, because the Premises were safer with a functioning Alarm than without one.

To begin with, it is not at all clear that the theory of § 323 has been adopted in Rhode Island. It is true that "[e]ven one who assumes to act gratuitously, may become subject to the duty of acting carefully if he acts at all." *Davis v. New England Pest Control Co.*, 576 A.2d 1240, 1242 (R.I.1990). This statement, however, simply sets forth a particular situation in which a legal duty may be imposed. It does not extend to an adoption of the relaxed approach to problems of proximate cause which § 323 appears to dictate. Travelers cites no case in which the Rhode Island Supreme Court has substituted notions of reliance and/or increased harm for traditional rules of proximate cause, and this Court seriously doubts that such a case is forthcoming.

generally a question of fact, "[i]f there is any doubt as to the meaning of a provision, it should be construed against the drafting party." *Harbor Marine Corp.*, 459 A.2d at 492. Priority states that Carol Pearl and its attorneys drafted the Lease, and therefore that any ambiguity in the exclusion clauses should be resolved against Travelers as subrogee of the drafter.

However, the record indicates that Carol Pearl, when it took over the Premises from Pannullo, assumed the existing lease, and that subsequent leases were thereafter negotiated between Priority and Carol Pearl. There is no evidence, beyond Priority's statement, that Carol Pearl drafted the Lease itself; while Travelers does not directly contest this statement, it is not entirely clear that the present circumstances call for application of the aforementioned rule of construction.

In any event, the resolution of this issue is unnecessary in light of the lack of any ambiguity in the exclusion clauses.

More importantly, even if the rule of § 323 were the law in Rhode Island, Travelers' claim thereunder would fail; Priority quite simply did not "undertake" to provide any "service" to Carol Pearl upon which the latter could rely. An example of the type of "service" contemplated by § 323 is found in *In re Sabin Oral Polio Vaccine Products Liability Litig.*, 774 F.Supp. 952, 955 (D.Md. 1991). In that case, a federal agency, in regulating vaccines, was held to have "undert[aken] to regulate a potentially hazardous condition for the benefit of others." [4] *Id.* Another example is seen in *Russell v. City of Columbia*, 305 S.C. 86, 406 S.E.2d 338, 338–39 (1991), where police officers arriving on the scene of a disturbance prevented civilians attempting to aid plaintiff's intoxicated and injured decedent, and allowed the decedent to walk away from the scene. The decedent subsequently fell from a nearby railroad trestle and died. *Id.* The complaint was held to state a claim under § 323; in coming to the decedent's aid, the officers undertook to provide a "service" to him. *Id.* at 339–40. Likewise, in *Briere v. Lathrop Co.*, 22 Ohio St.2d 166, 258 N.E.2d 597, 599–600 (1970), a general contractor's employee, under no duty, voluntarily helped a subcontractor's employee to move a scaffold, from which a painter later fell. In doing so, he undertook to provide a "service" to the painter, and became liable for his negligent performance thereof. *Id.* at 602–3.

By contrast, no "service" was involved in *Doe v. Linder Construction Co., Inc.*, 845 S.W.2d 173, 181 (Tenn.1992). In that case, a construction company maintained a "model home" on a residential development site, and kept therein the keys to all purchased homes, for the purpose of completing certain work while the homeowners were not present. *Id.* at 175–76. An employee took the key to the plaintiff's home, entered it, and raped her. *Id.* The Court held that the company, in holding keys to the purchased homes, did not undertake to provide any "service" to the plaintiff; the company agreed only to complete its work, not to provide for the plaintiff's physical safety. *Id.* at 181.

Similarly, in *Florida Auto Auction of Orlando, Inc. v. U.S.*, 74 F.3d 498, 504–05 (4th Cir.1996), the Court found that the federal government, in enacting regulations requiring automobile exporters to present certificates of title to Customs officials before being allowed to export autos, did not undertake to provide a "service" to the plaintiff auto seller. A buyer from the plaintiff never paid for certain autos, and thus never obtained certificates of title therefor; Customs officials nevertheless allowed the buyer to export the autos. *Id.* at 500–01. The Customs officials' conduct was not actionable under § 323, because the purpose of the regulations was not to protect the plaintiff, but was rather to deter removal of stolen autos from the United States. *Id.* at 504–05.

Finally, no "service" was provided to the plaintiff where a ski area's employee manual instructed employees to obtain the names and addresses of all parties involved in skiing accidents. *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 665 A.2d 39, 43 (1995). The purpose of these instructions was held to be the protection of the mountain from liability, not the assistance of the parties to the accident. *Id.* Thus, where an employee failed to identify a reckless skier who caused an accident, the skier injured in that accident could not state a claim against the ski area under § 323. *Id.*

In the present case, it is clear that Priority did not undertake to provide any "service" to Carol Pearl under § 323. That Priority's maintenance of the Alarm may have been known by Carol Pearl, and may have benefited Carol Pearl, does not mean that in maintaining the Alarm, Priority ever undertook to do anything for the *purpose* of benefiting Carol Pearl. Rather, Priority obviously maintained the Alarm for the sole purpose of protecting its *own* property, *not* that of its landlord.

Nothing in the record suggests otherwise; indeed, Travelers' own Response to Defendant's Motion for Summary Judgment states, "Priority maintained and used this alarm system until in or around 1991 *for the protection of its business and property.*" (emphasis add-

4. This case involved *Restatement (Second) of Torts* § 324A (1965), which tracks § 323 but addresses liability to third persons for negligently undertaking to render services.

ed). In support of this statement, Travelers cites the following deposition testimony of Richard Casey, Priority's President:

> Q. And why did Priority Business Forms use the alarm system for that approximately eight and a half year period?
>
> A. Protection of my business.
>
> Q. Protection of your equipment?
>
> A. My equipment and business, yes.

*Transcript of Richard Casey Deposition,* at 31–32. No clearer evidence that Priority did not, in maintaining the Alarm, undertake to provide any "service" to Carol Pearl, could be desired. Even Carol Pearl apparently labored under no illusions regarding Priority's motivation for maintaining the Alarm; Ronald Spagnole, a principal of Carol Pearl, testified at his deposition as follows: "My basic assumption was that ... if something was available for [Casey] to use for protection of *his* business, *his* property, *his* machinery, so on and so forth, I would have assumed he would have been using it ...." *Transcript of Ronald Spagnole Deposition,* at 17 (emphasis added).

Thus, the embers of Travelers' claims against Priority are doused by Travelers' inability to satisfy the essential elements of § 323, and the Court grants summary judgment in favor of Priority on Count III of the Complaint.

VII. Conclusion

As a result of the foregoing, the Court grants Priority's motion for summary judgment as to all counts in the Complaint. The Clerk shall enter judgment for defendant Priority, forthwith.

It is so ordered.